## GIANT MFG. CO. v. YATES–AMERICAN MACH. CO.

### No. 11501.

Circuit Court of Appeals, Eighth Circuit.

April 22, 1940.

Rehearing Denied May 11, 1940.

lation of implied warranties as a set-off and counterclaimed for damages because of violation of the warranties. At the close of testimony for defendant, the court sustained a motion by plaintiff for a directed verdict for the full amount sought. From a judgment entered on the directed verdict, defendant appeals.

The contentions appellant makes here are (1) there was sufficient evidence of an implied warranty to require submission to the jury[1]; and (2) certain material evidence was improperly excluded.

### I. Implied Warranty.

Appellant claims violation of implied warranty (a) because of reliance on the judgment of appellee (who had knowledge of the use to which it intended to put the coils) to furnish coils suitable therefor; and (b) lack of merchantable character of the coils because of leakage. Sometimes, suitability for the use intended by the buyer and suitability for the use intended by the seller—the general use for which the article was made—coincide. See Parsons Band-Cutter & Self-Feeder Co. v. Mallinger, 122 Iowa 703, 98 N.W. 580; Kelsey v. J. W. Ringrose Net Co., 152 Wis. 499, 140 N.W. 66; Keenan v. Cherry & Webb, 47 R.I. 125, 131 A. 309, 311.

We consider next the evidence (favorable to defendant) bearing on the existence of warranty.

Defendant manufactured specialties— various lines of equipment, including playground apparatus and flood light projects used for sports—prior to 1937 it had no experience with manufacture of air cooling units.[2] In the spring of 1937, it employed Arthur Collins. He had been engaged in the manufacture of an air cooling unit during 1935 and 1936. He had constructed part of the unit himself. In his cooling unit, he had used coil units bought from plaintiff. Early in April, 1937, he negotiated with defendant for the manufacture of this cooling unit with the result that it took over

Paul E. Robertson, of Council Bluffs, Iowa, for appellant.

George H. Mayne, of Council Bluffs, Iowa (Mayne & Mayne, of Council Bluffs, Iowa, on the brief), for appellee.

Before STONE, GARDNER, and SANBORN, Circuit Judges.

STONE, Circuit Judge.

This is an action by a seller for a balance due on sale of "coils". The answer admitted the sale, prices and balance as alleged. It further pleaded vio-

---

[1] A contention as to an express warranty was withdrawn at the oral argument.

[2] This cooling unit consisted of a box or cabinet into which fitted a "coil" of approximately the same front surface size. Cold faucet water ran through the coil. In the box in front of the coil, was a fan directly connected to a small motor. The action of the fan drew the normal warm air through the coil and out into the room. Thus the air cooled by contact with the coil was circulated in the room. The coil unit was constructed of pipes fastened to metal tanks (or shells) which, in turn, were connected to water and to drain pipes. It is the coil unit which is here involved. The assembly of the coil, the fan and the motor in the box was done at defendant's plant.

such manufacture and employed him in connection therewith.

The negotiations for a coil unit for this manufacture of a cooling unit by defendant began with a wire from Collins to plaintiff, of April 19, 1937, asking "new quotations on 15 x 15 and 20 x 20, 3-pass coils, in lots of 25 or more." Having received no wire answer by afternoon of that day, Collins wrote a letter quoting his wire and asking quotations also on "10 x 10, 3-pass coils and the 30 x 30 2-pass coil." Further, he set forth his connection with defendant, its intention to take up cooling and heating manufacture, its financial standing, and requesting prompt submission of quotations asked.

Shortly after this letter and before reply thereto, Collins visited the plant of plaintiff. While there, he talked with various officers and men of plaintiff. He outlined the business intentions of defendant concerning sale of the cooling unit and the use of the coil unit therein. Another matter discussed was improvements (reinforcements) recently made by plaintiff to eliminate leaks in the coil—a matter of occurrence to Collins in use of such coils in 1936. A test was made of three of the improved coils in his presence. They sustained pressure of 45 pounds without leaking.[3]

April 23, 1937, after return of Collins, plaintiff wrote, attaching quotation price sheets. Therein, it called attention to higher prices "than last season" due, in part, to "several changes in the coils to strengthen them against pressure. The gauges of the water tanks have been changed from No. 20 to No. 18 gauge and we have also added No. 16 gauge coated steel reinforcements which we believe will eliminate the trouble experienced last year with leaks." The letter stated, also, "We have been given a pretty clear picture of what you are setting about to do in the line of cooling for this season, and the writer is taking care of the various requests that you made while at our plant. It is deeply regretted that Mr. Birdsell [general manager of plaintiff] was not at the plant when you arrived so as to discuss the matter of cooling coils with you personally and obtain information first hand." The quotation sheet quoted prices, respectively, on "Air conditioning coils to our drawing RD–1580 with our No. 956 tubular core, which is our 10" x 10" three pass type", "Air conditioning coils to our drawing RD–1304 with our No. 956 tubular core, which is our 15" x 15" three pass type" and "Air conditioning coils to our drawing RD–1313 with our No. 956 tubular core, which is our 20" x 20" three pass type."[4] April 27, 1937, Mr. Birdsell wrote a short letter regretting missing Mr. Collins and stating: "I believe Mr. Evans told you about the improvements we have made in our air conditioning coils for the coming year so as to give them a greater factor of safety against accidental pressure."

April 26, 1937, defendant sent order for 50 of the 15 x 15 coils and 25 of the 20 x 20 coils. April 29th the order was acknowledged and plaintiff wrote "Your order has been entered and work started on these coils * * * we will make every effort to expedite delivery of cooling units covered by your order." On May 12th, 22nd and 26th and on June 2nd there were further orders.

May 11, 1936, Birdsell wrote Collins of going to a dentist office and seeing there "a home made air conditioner similar to the Collins Air Cooler."

Shipment of these orders began June 8th and continued (18 shipments) at intervals up to July 22nd.

Shortly after making up the cooling units, defendant encountered complaints and trouble from leakage in the coils. On July 2nd, defendant wired plaintiff as follows: "Your Coils are Leaking Badly Test All Before Shipment. Letter Follows."

The letter of the same date was as follows:

"We have run into a most serious and appalling difficulty with your coils. During the past week we have had two serious claims for damages which have occurred because of the leakage of your coils in our equipment.

---

3 Coils of this low pressure type are "not supposed to have more than 25 pounds working pressure." ;

4 There is a further undated similar quotation on "Air conditioning coils to our drawing RD–1581 with our No. 954 tubular core, which is our 30" x 30" two pass type."

"Immediately upon receipt of word from our customers indicating that they were having leaky coils, we made up a test tank to test what we have on hand, and we find that over 25 per cent are leakers. That makes an exceedingly serious state of affairs. Some of those leakers we will be able to repair in our shop. The balance of course, will have to be returned to you because we cannot get at the holes with the equipment that we have.

"Of course the damages that fall on us by reason of leaky coils will all have to be passed on to you. Mr. Collins tells us that he had your absolute assurance that every one of those coils was tested with air in a water tank before they were passed at your plant. We would like to know what you have to say for the situation."

July 7th, defendant wrote:

"We are today shipping you four coils which are such bad leakers that we cannot make the repairs here in our own plant. We did repair quite a number, and have a repair bill of about $25.00 for the rechecking of all of this shipment.

"We are not yet in receipt of the bills for damages sustained by our customers who installed equipment in good faith without suspecting the coils, but I understand that we will be billed about $50.00 for repair work from two customers, and that when those bills come through we, of course, shall pass them on to you because we were led to believe that the equipment was coming to us fully tested and that there would be no necessity of our being forced to recheck it. Now that this serious emergency has arisen of course, we shall spend the money to test every coil that comes to us."

July 19th, plaintiff wrote it had tested the four returned coils and stated:

"We have found core leaks in two of the radiators, a tank leak in one radiator and in the fourth radiator a tank leak and also a leak between the core and header plate.

"The writer is planning to be in Council Bluffs either the latter part of this week or the early part of next week and will look forward to seeing you then."

Shortly after July 19th, Birdsell went to defendant's plant. He said: "he had come to look into the difficulty that we were having, study it and help us out of our trouble."

He was taken into the factory where: "we discussed these bad coils that we had there, and he said that the condition of these coils was due to the pressure of production in their factory, that they had had an unusually heavy flow of business and because of that, and because this job was considered a special with them they had pulled in a lot of inexperienced men in order to hurry them out and to fill our orders because they were being pressed and they were having some little labor difficulty in their factory at that time. And he said that he was going to go back home and complete their work on their new model coil and as soon as that was ready and he could stand behind it he would send up some samples out here to Council Bluffs to test and to determine whether they could be relied on to go into our equipment and give us real service."

Defendant, shortly after, stopped production on its cooling unit until the next season when it procured a satisfactory coil unit from another party.

Evidence from Collins showed also that he had used the same coils from the plaintiff in 1935 and 1936 (except he used only one size—20 x 20) and had experienced trouble from leakage. Collins testified: "While I was in that business for myself and before I went to the Giant Manufacturing Company, I used these coils manufactured by the plaintiff. That was a standard coil and they were different sizes. They were sold to anyone who wanted to buy them. After I contacted the Giant Manufacturing Company, I was contemplating using the same type of coil and I went down to Beloit and talked to them about it, and the first order that I gave was for a certain number of standard coils that they manufactured. There had been small changes made in the coils between the time I used them and those that were ordered by the Giant Manufacturing Company."

Collins testified also that when he talked with plaintiff's officers and men when he went to the plant of plaintiff before any orders were given, he knew: "that in the use of these coils in the air cooling business there is possibly a greater likelihood of developing leaks than in

other uses due to the fact of the greater pressure and pulsation or vibration."

Two letters from Collins to plaintiff in December, 1934, reveal that he had then been experimenting for two years with "house cooling" and was familiar with conditions to be met and apparatus therefor; that plaintiff was "going to make fin coils for air conditioning purposes" and had such coils; that Collins secured a sample; that he asked quotations on three sizes ("10 x 10 inches, 15 x 15 and 20 x 20 inches"), and, as to construction, suggested that: "These to be equipped with a water leg on both ends with a half inch pipe, nipple or coupling securely fastened in on the bottom of one side and the top of the other as per rough pencil sketch enclosed. The 10 x 10 and 15 x 15 to be four rows of tuber deep and the 20 x 20 to be both two rows and four rows."

Collins testified that he used coils so constructed up to the time he went with defendant. Defendant used the same construction of coils except there were six rows of pipes instead of four—a change suggested by Collins.

A summary of the above evidence is as follows: Defendant's officers were entering a new field of manufacture (air cooling units) in which they had no experience. They took over an apparatus developed by Collins. An element therein was the coil unit. Collins was their representative to procure such coil unit. He had had several years' experience in the problem of cooling units and construction of them. He had been making and selling them for about two years. He had had about two years experience in use of the coils made by plaintiff which included certain construction changes suggested by him. He had experienced some leakage in these coils. Plaintiff endeavored to remedy these defects by certain changes in construction. Before ordering coils for defendant, he went to the factory of plaintiff where the improved coils were tested for leakage in his presence. He must have been convinced that the leakage defects had been reasonably removed or he would not have, immediately thereafter, placed orders for them for defendant. Plaintiff was manufacturing coils to be used in house cooling units. It knew that such was the use intended by defendant. It knew where the coils were to be shipped for installation in the cooling units. It knew the cooling units were designed for distribution and use in several States. Early cooling units put out with these coils by defendant leaked. This led to tests of the coils, before installation, by defendant. From 35% to 50% of them, thus tested, showed leaks. Plaintiff's manager, Birdsell, said they had been hurried in manufacture of these coils and had used some inexperienced labor. The unreliability of the coils compelled defendant to abandon manufacture of cooling units for the season of 1937. Thereafter, it resumed such manufacture, using coils from another maker, with satisfactory results.

Both Iowa and Wisconsin have a Uniform Sales Law, St.Wis.1939, § 121.01 et seq., Code Iowa 1939, § 9930 et seq. The provisions (here pertinent) as to "implied warranties of quality" are the same.[5] Paragraphs "5" and "6" of the

5 As stated in Code of Iowa, 1939, Sec. 9944 [§ 15], such provisions are as follows:

"Implied warranties of quality. Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

"2. Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be of merchantable quality.

"3. If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"4. In the case of a contract to sell or a sale of a specified article under its patent or other trade name there is no implied warranty as to its fitness for any particular purpose.

"5. An implied warranty or condition as to quality or fitness for a particular

statutory section, quoted in footnote 5, have no possible application to the fact situation here. Although defendant contends otherwise, paragraph° "1" of the section is not involved here because the buyer's agent (Collins) was an experienced man in the trade who knew what he wanted, who had had experience with the coils made by plaintiff, and who had selected the kind of coils ordered—no reliance was placed upon plaintiff to select the kind of coil suitable for installation by defendant and it made no such selection.

Paragraph "3" of the section is not applicable because the only examination made of the coils (that by Collins at the factory of plaintiff) not only was not such as might have revealed the leakage faults but tended to convince that such faults did not exist.

Paragraphs "2" and "4" of the section are the ones involved here. Plaintiff relies on paragraph "4", insisting that these sales were of "a specified article under its * * * trade name" and, therefore, there could be no implied warranty "as to its fitness for any particular purpose." Defendant relies on paragraph "2", insisting that "where the goods are bought by description from a seller who deals in goods of that description, * * * there is an implied warranty that the goods shall be of merchantable quality" and that these coils were not of merchantable quality.

To determine this controversy, it is unnecessary to examine at length the meanings of these two paragraphs of the section. It is enough here to say that paragraph "2" authorized an implied warranty of merchantable quality and that paragraph "4" does not proscribe such a warranty. In this regard, there is no conflict nor essential difference between the paragraphs. One meaning of merchantable quality is that the article sold shall be reasonably suitable for the ordinary uses it was manufactured to meet. Kelsey v. J. W. Ringrose Net Co., 152 Wis. 499, 140 N.W. 66; Parsons Band-Cutter & Self-Feeder Co. v. Mallinger, 122 Iowa 703, 98 N.W. 580, 582; Alpha Checkrower Co. v. Bradley, 105 Iowa 537, 75 N.W. 369, 371; Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co., 2 Cir. 23 F.2d 416, 419, certiorari denied 277 U.S. 599, 48 S.Ct. 560, 72 L.Ed. 1007; Keenan v. Cherry & Webb, 47 R.I. 125, 131 A. 309, 311; 55 C.J. 751 and note 44, 757 and note 95, 761 note 46; 24 R. C.L. 187, Sec. 459 and notes 8 and 9, 193, Secs. 464 and 465 and notes 14 and 19, 203, Sec. 475 and notes 7 and 8. "Particular purpose", as used in paragraph "4" means a usage other, or different (in kind or extent), than the ordinary uses the article was made to meet.

■ Here, the coils did not serve the purpose for which they were made—as a unit in a cooling system. This was established by the leakage under actual operating conditions but more especially by the leakage of from 35% to 50% of them before any installation in defendant's cooling system.

Plaintiff urges that the coils were tested by it before shipment and were sound and that there is no showing that this condition was not changed in transportation. When consideration is given to the character of the coils; to the knowledge of plaintiff that they were to be shipped to defendant; to the evidence of hasty fabrication by inexperienced labor; and to the large percentage of coils which were defective on arrival, it cannot be said that there was no substantial evidence of defective manufacture.

Other matters presented on this appeal are not determined since the court erred as to sufficiency of the evidence to require submission as to implied warranty and, for that reason, the judgment must be reversed and the case remanded for retrial.

purpose may be annexed by the usage of trade.

"6. An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."