Argued March 24; affirmed May 25, 1943

# STONEBRINK *v.* HIGHLAND MOTORS, INC., ET AL.
### (137 P. (2d) 986)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY and BRAND, Associate Justices.

*F. C. McDougal,* of Portland, (E. L. McDougal, of Portland, on the brief) for appellant.

*Arthur S. Vosburg,* of Portland (Reynolds, Flegel & Smith, of Portland, on the brief) for respondent.

BELT, J. This is an action to recover damages for personal injuries alleged to have been sustained as a result of a breach of implied warranty of merchant-

ability and fitness arising out of the sale by the defendant Highland Motors, Inc., a corporation, to plaintiff of a new automobile bumper jack in connection with the purchase of a second-hand used automobile. A judgment of voluntary nonsuit was taken as to the defendant General Motors Sales Corporation, the manufacturer of the jack. The cause was submitted to the jury as to the defendant seller and a verdict returned against it in the sum of $5,000. From the judgment entered thereon, the defendant appeals.

The Highland Motors company is engaged in the business of selling at retail automobiles and accessories in the city of Portland. On November 4, 1938, plaintiff purchased from defendant a used La Salle car. In this transaction plaintiff turned in his Chrysler sedan and paid in addition thereto the sum of $525 in cash. It was understood and agreed between the parties that plaintiff had the right to retain the tools used with the Chrysler car. As a part of his equipment, plaintiff had a hydraulic jack. The defendant, through its general sales manager, explained to plaintiff that such jack could not be put under the axle of the La Salle car as it was swung lower than the Chrysler and that a bumper jack was the only kind that could be used on a La Salle car. Plaintiff testified that he relied upon the latter's judgment and exchanged his hydraulic jack for a "brand new bumper jack." The seller took from the shelf a new bumper jack sealed in a cardboard carton and gave the same to plaintiff who put it in the trunk of the La Salle where it remained in the original package and was not used until a puncture in the right rear tire occurred about a year later. Plaintiff thereupon took the jack from the trunk and placed it under the bumper for the purpose of raising

the car in order to put on a spare tire. He said it was necessary to raise the bumper between 20 and 24 inches before the wheel cleared the ground sufficiently to take it off the rim. Plaintiff said the jack was put on a level hard-surfaced road and that, before using it, he placed the car in gear and put on the brakes but did not block the wheels. While the car was jacked up, plaintiff reached into the trunk compartment to get a wrench and he said that something struck him and rendered him unconscious. He thus testified:

"Q. And as you reached in for this wrench, did you succeed in getting hold of the wrench? A. No.

"Q. What happened? A. I don't know.

"Q. Did something strike you? A. Something hit me, yes.

"Q. Were you touching the car when this hit you? A. No.

"Q. Did you touch the jack when this hit you? A. No.

"Q. What is the next thing that you remember? A. Oh, I don't know. My wife wiping my face."

Plaintiff's wife, who was with him at the time of the accident, described how it occurred:

"Q. Now we are at a point where Mr. Stonebrink has the jack in his hand and the trunk lid is open. Now, tell the jury just what he did with the jack. Tell it in detail, if you please. A. Well, he put the jack on that plate that fits underneath, and fit it underneath where the bars come out on the trunk, and there is a V there, and he fit those two little dogs right together, and the long part of the jack comes up between this V, and the dogs fit out on the sides. Then he put the handle in and proceeded to jack it up until the tire was free * * * *.

* * * * * * *

"Q. And then what did he do; what happened next?. A. Well, he went to get the spare tire. There is a bolt or something that holds the spare tire, to keep it from working out of the trunk, and if he went to get the wrench to take it off, that is what I imagine he would have done, but he just bent down like that to go under the lid that was raised up, and he bent down like that, and I was standing back here, and all at once the car just came down like that, with a terrific crash.

"Q. When you say he went to get the wrench for the tire, was he touching the jack? A. No.

"Q. How about the automobile? A. Well, there was no car there to touch, because he was back away from it. He just bent down like that (illustrating); he couldn't have touched the car, and I know he didn't.

\* \* \* \* \* \* \*

"Q. Now what happened to Mr. Stonebrink when the thing came down? A. Well, when it first hit him, his head went down like that, and I imagine it was the lid of the car that hit him, and it threw him sideways, and he was laying on his left side about, maybe from here to this gentleman away from me—about five feet, I would say.

\* \* \* \* \* \* \*

"Q. \* \* \* \*. After this car came down, did you notice where the jack was? \* \* \* \*. A. It was still under the car.

"Q. (interrupting). Now after this car came down, this upright, where was it? A. It was still in that V where the arm comes out to the bumper."

Walter O. Paulson, who operates a machine shop and has had 25 years' experience in handling and treating various kinds of "metal, steel and iron" and who was familiar with jacks and had examined the jack in question, qualified, over the objection of defendant, as

an expert witness. The substance of his testimony is that the jack was made of cheap, soft metal and poorly constructed; that the rachets are not safe and the metal not strong enough to hold with safety the weight of the car; and that the "slightest misalignment" of the jack would cause it to slip. Inspecting the jack, the witness pointed out that one tooth near the top of the shaft had been completely sheared off or pressed back and "as soon as that broke away the whole thing skipped right over the tops of the others and allowed the car to drop." The jack was introduced in evidence and its condition corroborates the witness's statement that the tooth referred to had been completely sheared off and the other teeth below were also partially sheared off.

H. E. Kurtz, a machinist who has had many years of experience in the shaping and fabricating of various kinds of metals and who, at one time, was employed in the repair and manufacture of jacks, qualified as an expert witness. After examining the jack in question, he stated that it was made out of the "cheapest metal that you can buy" and described certain structural defects in it. On direct examination, the record discloses the following:

"Q. Well, Mr. Kurtz, what I am getting at is, from your knowledge of jacks and that particular jack in question, and assuming that you have an automobile that weighs 3830 pounds, would you say that the jack was or was not a reasonably fit jack for raising an automobile weighing that weight?

Mr. McDougal: "Yes or no. A. Yes.

"Q. Why do you say that, sir? A. Well, because the average person would take a jack out of a car and never examine the jack at all, and just put it underneath the car and start raising it up

to change the tire. That is the reason I would say that it would be fit, and it might hold up a car.

"Q. Well, from a mechanical standpoint, what would you say? * * * *. A. Well, the teeth not being deep enough, and the round edge on there, that is the main part of a jack. You have got to have something there to support that tooth, and being that they have got the play in here as it has, allows that dog to become disengaged and there isn't a thing there to hold the jack."

The motion of defendant for a directed verdict presents the vital question as to whether there is any substantial evidence tending to support the verdict. The motion for a directed verdict is based upon the following grounds:

"(1) The evidence conclusively shows that the LaSalle automobile sold by the defendant to the plaintiff was a used automobile and there is no implied warranty applying to the sale of used or second-hand automobiles or machinery.

"(2) The evidence conclusively shows that at the time of the sale a retail sales order was signed by the parties covering the sale transaction and that said written instrument expressly disclaimed, negatived and therefore excluded all implied warranties.

"(3) That there was no breach of the implied warranty upon which plaintiff's cause of action is based because the evidence conclusively shows that the jack was and still is reasonably fit for the purpose for which it was intended, namely: to lift and hold up a 1938 LaSalle sedan.

"(4) That plaintiff has failed to establish by substantial evidence that the jack was not reasonably fit for the purpose for which it was intended and has therefore failed to prove that there was a breach of implied warranty alleged in his complaint.

"(5) The damages sought to be recovered are too remote and were not within the contemplation of the parties as a probable result of the breach of the contract at the time they contracted for the sale and purchase of the automobile with its accessories."

■ The first ground for directed verdict is not tenable for the reason that the sale of "used or second-hand automobiles or machinery" is not involved. We are concerned here with the sale of a new bumper jack.

■ Defendant can not reasonably rely upon the written disclaimer of warranties "express or implied" as such instrument, under its terms, applied only to the automobile and its parts. Such disclaimer had no application to the sale of the jack. That was a separate and independent transaction although it arose out of the sale of the automobile.

■ That damages for personal injuries directly and naturally resulting from the alleged breach of warranty are recoverable is well settled. *Wells v. Oldsmobile Co.*, 147 Or. 687, 35 P. (2d) 232. Also see 24 R. C. L. 261 and notes 90 A. L. R. 1269 and 74 A. L. R. 343.

■ Plaintiff relies upon subdivision (1), §71-115, O. C. L. A. (Uniform Sales Act), which provides:

"Where the buyer, expressly or by implication, makes known to the seller that particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

Clearly, there is substantial evidence that plaintiff, in procuring the jack, relied upon the judgment of the

seller. It was the seller who convinced the plaintiff that the jack in question was the kind needed for his particular use. We think there is also substantial evidence tending to show that the jack was not reasonably fit for the purpose for which it was intended and was not of merchantable quality. In order that there may be an implied warranty of fitness to which the above subdivision of the statute applies, it is essential that (1) The seller must have been informed, expressly or by implication, of the purpose for which the article was purchased; and (2) the buyer must have relied upon the judgment of the seller: *Rhodes v. Libby et al.*, 133 Or. 128, 288 P. 207. See cases cited in Uniform Sales Laws Annotated, Vol. 1, Sales Act, p. 133. The seller, under the act, is not bound to furnish the best jack in the market (24 R. C. L. 204; *Juvland v. Wood Bros. Thresher Co.*, 212 Minn. 310, 3 N. W. (2d) 772) but would, in the light of this case, be under obligation to sell one reasonably fit, when used properly, to sustain the weight of an automobile after being raised. If an automobile jack under ordinary use will not accomplish such purpose, it is worthless. We agree that res ipsa loquitur does not apply. The mere fact, in itself, that the car fell and injured the plaintiff does not establish a prima facie case.

True, the demonstration of the use of the jack during the trial tended to refute the evidence introduced by plaintiff that the jack would not sustain the weight of the La Salle, but we are not prepared to say that it conclusively overcame such evidence.

In this transaction, the seller knew the particular purpose—indeed, the only purpose—for which the jack was purchased. In view of the evidence concerning the defective condition of the jack it might well

be concluded that it would not serve the general purpose of such mechanical device. Hence, there is no need of discussing the distinction between implied warranties of fitness and merchantability. Allowing the plaintiff the benefit of every reasonable inference from the evidence, the sale in question involved a breach of both implied warranties.

■ As said in *Keenan v. Cherry & Webb*, 47 R. I. 125, 131 A. 309:

"*\* \* \** Under the Sales Act a dealer who sells articles which ordinarily are used in but one way impliedly warrants fitness for use in that particular way, unless there is evidence to the contrary. This is only a warranty of merchantability."

The above decision quotes *American Tank Co. v. Revert Oil Co.*, 108 Kan. 690, 196 P. 1111, wherein numerous cases are cited where merchantability is held to be identical with fitness for the particular purpose of the buyer.

■ There is no doubt that the falling of the car was the direct and proximate cause of the plaintiff's injuries. If the jack, on account of faulty construction and cheap material, was unfit for the purpose for which it was intended, the seller might reasonably anticipate that a person using it in the normal manner would be injured. The law does not contemplate that the seller anticipate the particular manner of the injury.

Viewing the record in the light most favorable to plaintiff, we are convinced that no error was committed in denying the motion for a directed verdict.

■ Whether a witness is qualified to testify as an expert is a matter resting within the sound legal discretion of the trial court and its ruling in reference thereto will not be disturbed on appeal unless there is

an abuse of discretion: *Goldfoot v. Lofgren,* 135 Or. 533, 296 P. 843; *Porter Const. Co. v. Berry et al.,* 136 Or. 80, 298 P. 179. The trial court properly held that Paulson was qualified to testify as an expert.

It was contended by defendant that Paulson invaded the province of the jury in giving his opinion as to what caused the jack to collapse at the time it was being used by plaintiff. The answer was in response to a hypothetical question wherein the evidence was recited as to the manner in which the jack was used. The witness had previously inspected the jack. We think the cause of the collapse of the jack was a proper matter for the expression of opinion of witnesses skilled in the use of metals and of a machine of such character. The average juror would have slight knowledge concerning the tensile strength of the metal used in the jack in question or as to its alleged structural defects. It was a subject well within the realm of a "science, art, or trade". Subd. 9, § 2-228 O. C. L. A. His answer, "Yes, it might be capable" was certainly not damaging to the defendant. It is true that some parts of his testimony in explanation of such answer were prejudicial, but no motion was made to strike the same. Complaint is made in the brief of appellant about permitting the witness Paulson to state that the jack was not reasonably fit for the purpose for which it was intended, but a careful examination of the record fails to disclose that such question was answered by him.

Numerous objections in the brief are made to the testimony of Kurtz, the other expert, but the record is silent in reference thereto. Defendant was content to move to strike his entire testimony, some of which was undoubtedly admissible.

In *Demarais v. Johnson et al.,* 90 Mont. 366, 3 P. (2d) 283, 77 A. L. R. 553, it was held proper for an expert witness to testify that the collapse of an automobile wheel was due to loose spokes in the wheel. An expert witness, in *Suess v. J. S. Stearns Lumber Co.,* 143 Wis. 609, 128 N. W. 443, was properly permitted to give his opinion as to the cause of the bursting of a cylinder in a steam engine. In *Pfeifer v. Eastern Metal Works,* 258 Ill. 427 101 N. E. 548, an expert witness in a personal injury action testified, after inspection of a chisel, as to what caused it to break. The court on appeal said:

"* * * We do not think the facts brought out by this testimony were of such character that they were within the knowledge of all men of common education and experience, and the expert witness' testimony was therefore admissible."

In *Ebbert v. Philadelphia Elec. Co.,* 126 Pa. Super. 351, 191 A. 384, an expert witness was permitted to testify, after an examination of a washing machine, as to why the safety appliance failed to operate and that, in his opinion, this failure was caused by a defect in manufacture.

■ The issues were fully and fairly covered in the instructions. We see no error in failing specifically to instruct the jury that the "damages must have been within the contemplation of the parties", as no timely request so to do was made by defendant. The court, however, did instruct that in order for plaintiff to prevail it must be established by a preponderance of the evidence that "said breach of warranty, if any, was the proximate cause of plaintiff's injuries and damages."

Finding no reversible error, it follows that the judgment is affirmed.