James BURKE, doing business as James Burke & Co., Plaintiff,
v. Sam THOMAS, doing business as Peter Thomas
& Company, Defendant.

No. A–8203.

District Court, Alaska. Third Division. Anchorage.

Jan. 19, 1955.

386

388

Edward R. Arnell, Anchorage, for plaintiff.

Wendell P. Kay, Anchorage, for defendant.

HODGE, District Judge.

The plaintiff in this action seeks in his amended complaint to recover the sum of $10,000 as special damages on account of repairs made for breach of warranty on a written contract whereby the defendant agreed to build for and deliver to plaintiff certain trailers and trailer vans manufactured by defendant. By his supplemental complaint he seeks to recover the sum of $17,588.55 as general damage resulting from the loss of approximately five years of the usable life of the vans and trailers; and also for additional costs of repair of the vans and trailers incurred since the commencement of the action, in the sum of $12,000. An additional claim for damages in the sum of $18,000 as loss of profits on account of insufficient payload was stricken by the court at the trial. Both the complaint and supplemental complaint allege general inferior workmanship and materials in construction of the vans and trailers.

The defendant denied the allegations of the complaint except as to admission of the contract and by affirmative defense claimed that no warranties of any kind were contained in the contract between the parties, or implied by law; that any damaging to the equipment, as alleged, was caused by reason of the neglect, abuse and lack of maintenance by the plaintiff in the operation of same, and that the damages claimed are uncertain, speculative, and wholly lacking in definiteness.

At the trial, which consumed seven and one-half days, a written instrument was admitted in evidence dated January 19, 1952, delivered by defendant to plaintiff at Anchorage, consisting of a written offer by the Peter Thomas Company to build two special 35 ft. "combination semi trailers" per certain specifications, including 17,000 lb. Timkin axles, full Parrish frame, stake pockets, and 10 x 20 x 12 tires, at a

specified price, which was signed by Alaska Sales & Service, sales representative of defendant, and by Burke.

On March 8, 1952, following further conferences between the parties and their representatives at Anchorage, a written order was placed with the Peter Thomas Company, through its sales representative and signed by Burke, for the two combination trailers, therein designated as "vans", together with nine flat bed trailers, at specified prices totalling $64,-496.00, with various dates for delivery. This order contained no specifications except that both vans and trailers were to be dual axle, and except for an item of stake pockets; but it was understood that the same specifications covering the vans were applicable to the trailers. Neither of these instruments contained any express warranties.

. These writings taken together were considered by the Court as a written contract, consisting of offer and acceptance. Hence evidence of any oral express warranties of defendant which may have been made during the negotiations between the parties, which became merged in said order, were excluded by the Court under the parol evidence rule; and the trial proceeded upon the theory of implied warranties as to general fitness and quality, upon which the plaintiff now bases his claim; except that defendant testified that he warranted all of the Thomas trailers as having a 20-Ton capacity. In this connection it was shown that defendant knew of a contract which plaintiff had for hauling construction materials from the dock at Anchorage and knew that both vans and trailers were to be used upon the gravel highways of Alaska. Delivery of the vans and trailers was made to plaintiff at Seattle, Washington, and driven to Anchorage, and were there put in use by plaintiff.

The law regarding implied warranties as to quality or fitness in Alaska is governed by the common law except as limited by the provisions of Section 29–1–45 A.C.L.A.

1949, being a portion of the Uniform Sales Act of Alaska, the applicable portions of which are as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality."

The case of Davenport Ladder Co. v. Edward Hines Lumber Co., 8 Cir., 43 F.2d 63, is an apt illustration of the application of this rule in a suit involving the sale of lumber of a certain description upon a sales order similar to the order in this case. We quote from this opinion, at pages 67–68:

"* * * so, where the buyer orders goods to be supplied and trusts to the judgment or skill of the seller to select goods or materials which shall be suitable for the purpose for which they are ordered, there is an implied warranty that they shall be reasonably fit for that purpose. * * *

"It is true that, where the buyer orders a specific article or material for a specific purpose, even though that purpose be known to the seller, no warranty of fitness will ordinarily be implied, but, where an article is desired for a particular pur-

pose and that purpose is known to the seller, and the buyer relies upon the seller to furnish him a suitable article, then a warranty of fitness will be implied, even though the article may have a well known and defined name or designation, or even though it be sold under a trade-name."

There are two essential elements which must be found in order for warranties to be implied. The first is that the seller must have been informed either expressly or by implication of the purpose for which the buyer acquired the goods; the second is that the buyer must have relied upon the seller's skill and judgment. Where plaintiff makes a purchase directly from the manufacturer without previous inspection there is an inference that the buyer relied upon the manufacturer's skill and judgment. Parker v. S. G. Shaghalian & Co. Inc., 244 Mass. 19, 138 N.E. 236.

If the buyer relied, and under the circumstances had reason to rely, on the skill and judgment of the seller who was the manufacturer of the article, the law implies a warranty that it is reasonably fit for the purpose for which it was designed. Bird & Son, Inc., v. Guarantee Const. Co., 1 Cir., 295 F. 451; Kansas City Bolt & Nut Co. v. Rodd, 6 Cir., 220 F. 750; American Mine Equip. Co. v. Butler Consol. Coal Co., 3 Cir., 41 F.2d 217; Stonebrink v. Highland Motors, 171 Or. 415, 137 P.2d 986.

With respect to the second sub-division of the statute quoted it is held that "merchantable quality" includes a warranty that the article sold shall be reasonably suitable for the ordinary uses for which it was manufactured. Giant Mfg. Co. v. Yates-American Mach. Co., 8 Cir., 111 F.2d 360; Stonebrink v. Highland Motors, supra; Williston on Sales, Vol. 1, Sec. 243, p. 642.

Considerable argument has been submitted as to whether or not the use to which the vans and trailers were to be put relating to the hauling contract of plaintiff covering con-

struction materials, and the use upon the highways of Alaska, was a "particular purpose" or a "general purpose". I find it unnecessary to make this distinction for the reason that such purpose of the goods supplied under this contract is expressly covered by the provisions of sub-section *l* of the statute.

■ All of the conditions relating to implied warranties of quality and fitness satisfactorily appearing from the evidence, I am of the opinion that such warranties were fully applicable to this sale.

The evidence of the plaintiff, corroborated by the sales representative, by the proprietors of two welding concerns who made the repairs to the equipment, and by two of the drivers, was to the effect that the following failures or defects occurred in the equipment commencing shortly after such was put in use, and continuing through all of such use to date: (a) failure of the frame to support ordinary loads within restrictions as to weight limit imposed by Alaska law, particularly at the "goose neck", being a bend in the forward part of the frame ending in a connection with the tractor hauling the trailer, described as a "critical" point, which became bent and required considerable repairs in an effort to strengthen such; (b) failure of the frame junction of the rear assembly, holding the tandem axles in place; (c) dual axle installation not flexible enough; (d) faulty truss work connecting the frame with the bed of the trailer; (e) faulty design of lubricating system, such that the trailers could not be lubricated satisfactorily; (f) insufficient "walking action",—to maintain the level of the trailer bed; (g) inadequate suspension system supporting the running gear; (h) a fault in axles "running out of line".

As a result of these imperfections, the evidence of plaintiff showed that the trailers and vans developed a "wow" or bend, castings cracked, frames bent under loads, constant trouble and failures of operation developed, all despite repeated attempts to repair the equipment, and that finally the

vans were abandoned after two years use except for emergency hauling.

 Defendant testified in substance that all of the various parts and materials which went into the construction of the vans and trailers were standard and were not deficient. Only the suspension system was the defendant's own type, the frame being ordered from a Los Angeles manufacturer and other parts also pre-fabricated; but the design and assembly were the defendant's. It also developed that no special stress analysis was made as to the trussed body frame but that they were the same as used in other trailers, including some sold to a Mr. Capehart of Anchorage. Capehart corroborated such evidence of satisfactory quality but it developed that he likewise had filed suit against Thomas claiming damages on account of defective workmanship, which suit has not been dismissed although he stated that he since found such allegations untrue. By reason of this, and the fact that he still owes Thomas money, such evidence must be viewed with distrust.

It also appears that following complaints made by Burke and the sales agent, Thomas sent his foreman and mechanic, Dubuque, to Anchorage, under whose supervision certain repairs were made to the trailers consisting principally of "beefing up" the frames at the goose neck, adding a steel plate inside the channel frames, or "boxing in", also replacing castings and trusses at a cost to Thomas of some $4,900, and that similar adjustments were made to the Capehart trailers. Dubuque testified that such work was done to meet the complaints but that he considered none of it necessary, which explanation did not appear consistent. The witness Aude testified (Deposition, pp. 27–28) that during this period, when Thomas made a trip to Anchorage, he stated that the trailers should have a heavier, logging type suspension system, owing to road conditions in Alaska; and indicated that the type of construction used was not adequate for such conditions.

Finally plaintiff called an expert engineer who, following an examination of the frame based on using high tensile steel, concluded that the trailers in their original condition when delivered could safely carry a load of only 15.15 tons, and that if the manufacturer warranted 20 tons he had seriously misrepresented his product. In answer, defendant called another competent engineer who found on examination based upon a telegram from the frame manufacturers as to the type of steel now used, that the trailers would not "yield" at 20 tons nor up to 40 tons. Plaintiff countered with further evidence of the engineer first called, based upon samples of steel cut from the frame, that the present safe load would only be 13.3 tons, being slightly less than his previous figure, accounted for by "fatigue". The evidence of this witness, considering the basis used, was more convincing.

Defendant also introduced evidence to show that the trailers had been overloaded. There was some such evidence of overloading on a few occasions only, without apparent damage, but the most convincing evidence on this point was from officers of the company with whom Burke had the hauling contract, showing that the average load hauled was 14 tons. The testimony of the witness Baylog, by deposition and orally, did not, taken together, support defendant's contention. There was no sufficient evidence of other abuse, or neglect. Evidence of failure of plaintiff to properly lubricate the trailers was not as convincing as the evidence of improper lubricating system, especially as to protection against water and dirt.

The preponderance of the evidence is in favor of plaintiff as to breach of warranty, except possibly as to the one item of "staying in line" which it developed could be corrected by adjustment. I find that the vans and trailers were defective in quality and workmanship for the use known to Thomas to which they were put, causing damage, although not so defective as to cause full depreciation after two years as claimed by plaintiff.

396

■■ The measure of damage for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from such breach; and in case of breach of warranty of quality, such loss, in the absence of special circumstances showing approximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty. Section 29-1-174(6), (7), A.C.L.A.1949. It has been consistently held that in addition to general damages, being the difference in value, special damages directly resulting from such breach such as repairs made to the goods in an effort to make such goods conform to the just requirements of the buyer and the conditions of the warranty, may be allowed. Such damages must be proved with reasonable certainty. Hudson Rug Refinishing & Cleaning Corp. v. Prime Mfg. Co., 7 Cir., 115 F.2d 615; Stevens v. William S. Howe Co., 275 Mass. 398, 176 N.E. 208; Dahl Implement & Lumber Co. v. Campbell, 45 N.D. 239, 178 N.W. 197; Minneapolis Threshing Mach. Co. v. Huncovsky, 52 N.D. 112, 202 N.W. 280; Grupe v. Glick, 26 Cal.2d 680, 160 P.2d 832; Suryan v. Lake Washington Shipyards, 163 Wash. 164, 300 P. 941.

■ There was no direct evidence as to the difference in value between the trailers and vans at the time of delivery and the value if they complied with the warranty; except the testimony of plaintiff that the vans (including one Thomas trailer previously purchased by him and the two combination vans included in the contract) had depreciated to the extent that they could be no longer used except in emergency and had been replaced by other makes, by reason of which plaintiff claimed $\frac{5}{7}$ths of the value as loss or damage, based on the normal life of the vans of seven years. Such proof was not established with the degree of certainty required. It developed that one of the vans had been involved in a wreck and total loss paid thereon less salvage; another was found by the Court on inspection of the equipment to be on a hauling job; and a third appeared to be

still in service. No such proof was offered as to the flat bed trailers. This claim cannot be sustained.

■ There was ample proof of repair bills incurred by plaintiff at the L. B. Welding Co. and the Atkins Welding Co. for labor and materials covering these vans and trailers amounting, after deducting all items not shown applicable, to $6,553.14. There was also sufficient evidence of the plaintiff, corroborated by an accountant, based upon a percentage of labor in his own shop on this equipment compared to labor cost on other trailers operated by him, which appears reasonable and not speculative, as contended by defendant, of an additional cost of repairs and maintenance due to such defective quality and workmanship of approximately $12,669, exceeding the amount claimed for such damage of $12,000.

■ Plaintiff urges that the Court reconsider its oral decision, eliminating the item of $18,000 claimed for loss of profits in the payload of the vans. The evidence disclosed that such loss was attributable to the type of the vans which, as expressed by the witness Kirkpatrick, were too impractical to meet competition, rather than due to faulty construction. This particular type was expressly ordered by plaintiff per specifications. Therefore, I still find that such claim cannot be sustained.

■ Plaintiff is entitled to recover judgment against the defendant for special damages incurred as outlined above in the sum of $18,553, together with his costs and an attorney's fee computed in accordance with Rule 45. Judgment may be entered accordingly.