Argued February 5, reversed and remanded July 1, petition
for rehearing denied but opinion modified Sep-
tember 16, 1959

## STATE HIGHWAY COMMISSION *v.*
## ARNOLD ET AL

341 P. 2d 1089
343 P. 2d 1113

44

46

*John C. McLean,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, C. W. Enfield, Assistant Attorney General and Leonard I. Lindas, Assistant Attorney General, Salem.

*Francis F. Yunker*, Portland, argued the cause and filed a brief for respondents.

Before McALLISTER, Chief. Justice, PERRY, SLOAN and O'CONNELL, Justices.

O'CONNELL, J.

The plaintiff brought an action to acquire by condemnation the defendants' interest in 21.52 acres of land located in Klamath County. From a verdict and judgment for $13,250 the plaintiff appeals.

The defendants' interest in the property involved consisted of a leasehold interest in the surface and the mineral rights. The plaintiff had previously acquired the fee subject to the foregoing interests.

The property taken includes one-third of a cinder cone, described as "Buckeye Butte," which is a geological formation of volcanic origin made up of a mineral aggregate useful for certain construction purposes including the surfacing of roads. The plaintiff acquired the property to obtain cinders for use on the highways in the immediate surrounding area.

There are a considerable number of similar cones in the area. Most of these are unopened as was Buckeye Butte at the time of the taking. Some of the cones are operated commercially although the closest of these are near Bend to the north and Klamath Falls to the south, each of these cities being approximately sixty miles from Buckeye Butte.

There is no large population center near the property taken which would serve as a market for cinders. The town of Chemult with a population of approximately 150 is a few miles to the north.

The Southern Pacific Company and several logging companies have opened cones in the vicinity for the

purpose of obtaining cinders for use as ballast and the surfacing of roads. The tracks of the Southern Pacific Company pass near the cone paralleling Highway 97.

At the trial the plaintiff took the position that there was no market for cinders in the vicinity and that the property taken had value only for grazing purposes which value was nominal. The defendants put a value of $130,000 on their interest.

The plaintiff admitted that the cinders in the Buckeye Butte deposit were of good quality for road surfacing purposes and that because of its location near the junction of two highways the cone was particularly desirable and valuable to it for such purposes. The plaintiff's principal contention is that there was no market value for the condemned property; that the special value of the property to the taker cannot be considered and that the jury was permitted to base its verdict upon this special value.

We shall first address our attention to the evidence upon the basis of which the jury could properly conclude that there was a market for cinder cones at the time of the taking, or in the absence of such a market whether the property had compensable value.

■ It is uniformly recognized that the special value of the property to the taker is not the proper measure of compensation. 3 Nichols on Eminent Domain (3d ed) § 8.61; 1 Orgel on Valuation Under Eminent Domain (2d ed) § 81; *Oregon R. & Nav. Co. v. Taffe*, 67 Or 102, 134 P 1024, 135 P 332, 135 P 515 (1913). The state contends that the value to the taker cannot properly be considered even though the property has value based upon considerations other than the taker's need.

■ One of the defendants' witnesses testified that in estimating the value of the cone he took into consid-

eration the fact that the state was preparing to relocate and repair the highway in the vicinity. When the witness was asked "How much of your market is attributable to the fact the State needed the cinders for a project begun in 1951, and the balance", he replied that he did not "know exactly" and that he did not make a segregation of these values. The plaintiff assigns as error the trial court's refusal to grant plaintiff's motion to strike the witness' testimony because it improperly contained a noncompensable item which could not be segregated from the total. We think that the motion was properly overruled. We do not agree with the assumption underlying the state's objection. It is stated broadly enough to assert that the value to the taker is not a valid factor in any circumstance, and that the market which is looked to in measuring market value is the market exclusive of the state. But this is not an accurate statement of the law. In estimating the value of the property it is entirely proper to consider the state's need for it if that need is not a special factor influencing the value which is placed upon it in the market. If the state's need for the property is in competition with other similar demands for it the state's participation in the market may be considered in arriving at the value of the condemned property. This idea is expressed in *United States v. Boston, Cape Cod & N.Y. Canal Co.*, 271 F 877, 893 (1st Cir. 1921), as follows:

"We are of the opinion that, in ascertaining the market value of the property taken in a condemnation proceeding the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose. If, however, the property has a special utility or availability, not only to the taker, but to other parties who could use

the property for the particular purpose intended by the taker, then this utility or availability may be shown."

In *Oregon R. & Nav. Co. v. Taffe*, supra, essentially the same principle is announced:

"* * * The fact that the plaintiff desired the property for a railroad right of way would not preclude defendants' recovery measured by its adaptability for that use, if such adaptability added to its market value generally. The particular value of the tract to plaintiff by reason of the location of the tract to its road, and considered with reference to plaintiff's connecting tracks, its established business, and its urgent need, should not be considered by the jury, nor shown by the evidence; but we understand no such evidence was admitted. The paragraph of 15 Cyc. 757 quoted by plaintiff in its brief further says: 'Some courts have gone so far as to say that in estimating the value of the land taken for a public use its value for such use cannot be considered; but the weight of authority is contrary to such a rule. There is a recognized difference between estimating damages by the value of the property to the person or corporation exercising the right of condemnation and considering the availability or adaptability of a piece of land for the purpose for which it is condemned as an element of value which would attract any buyer for that purpose. The true rule is that any use for which the property is capable may be considered, and if the land has an adaptability for the purposes for which it is taken, the owner may have this considered in the estimate as well as any other use for which it is capable.' This, we understand, is the correct rule, and is well supported by the cases, * * *." 67 Or 102, 114, 134 P 1024, 1028.

If, in the present case, it is solely the state's need which creates the market then, of course, this special need must be excluded in the evaluation of the property.

*United States v. Cors*, 337 US 325 (1949); see 4 Nichols on Eminent Domain, § 12.315. However, only the *special* value which the property has to the taker cannot be considered by the trier of fact. Where the *basis* for value to the taker is the same as it is with respect to others, the jury is entitled to consider the fact that the state is a part of the market. *Olson v. U. S.*, 292 US 246 (1934); *Mississippi & R. R. Boom Co. v. Patterson*, 98 US 403 (1878); see Hale, Value to the Taker in Condemnation Cases, 31 Colum L Rev 1, 16-24 (1931).

The defendants presented some evidence tending to show that there was a market for cinders in the area (from which it could be concluded that there was a market for the cinder cone in question) and, therefore, that the cone had value which was created by demands in addition to that of the state.

■ The plaintiff requested an instruction to the effect that in determining market value the jury should not consider "the value of the rights being taken by virtue of or which reference to the proximity of the cinder cone to the highway * * *." The requested instruction was not given, for which the plaintiff assigns error.

The requested instruction was properly rejected. Assuming that there was a market for cinders exclusive of the state, the proximity of the cone to the highway would be a relevant factor in assessing the cone's value because the cost of transportation to the purchaser would be an ingredient in fixing the price of the cinders removed from the cone. If the plaintiff intended the requested instruction to inform the jury that it would be improper to consider the special value of the property to the *taker* (because of the proximity of the cone to the highway) then plaintiff should have cast the instruction in language clearly expressing that idea.

■ The plaintiff contends that the court erred in giving the following instruction:

> "In arriving at the amount of damages to be awarded the defendants herein you should consider the availability of road building material, the increased or decreased cost of transporting it to those places of use, the costs of removing it from the pit, and all other elements which would enter into the fair cash market value of the product as of February 23, 1951."

The plaintiff argues that the instruction impliedly invited the jury to use necessity to the state as the measure of value. We read the instruction differently. It merely expresses the factors which are included in the market value for road materials whether they will be used by the state or by anyone else in the area. The instruction is improper for another reason, however. It makes reference to "the fair cash market value of the product as of February 23, 1951." As we shall point out more fully later, the property taken in this case is not the *product* of the cinder cone, but the cinder cone itself. It is possible to construe the instruction to mean that the value of the product may be considered in arriving at the value of the cone but the instruction given did not clearly convey this idea and could have been regarded by the jury as an invitation to substitute for the value of the cone the value of the cinders which could be produced from it.

We turn then to the question as to whether there was sufficient evidence to establish a market for cinder cones in that area. It was shown that there are numerous cinder cones in the area between Bend and Klamath Falls. There was testimony to the effect that the physical character of the cinders in these cones varied and that some were more adaptable to road uses and other

commercial uses than others. The cinders in the Buckeye Butte cone were adaptable to these various uses. The state contends however, that in the absence of its needs for the cinders the cone would have no value whatever. The value placed on the property by the state's witness was based upon the assumption that the cinder cone as such was valueless.

The defendants' witnesses attempted to show that there were both existing and prospective demands for cinders in the area. With respect to the present market in the area the evidence adduced by the defendants was rather vague and indefinite. One of defendants' witnesses, Mr. Barnes, who was engaged in the cinder, sand and gravel business in Klamath Falls testified that there was a market for the type of cinders found in Buckeye Butte, and that this market consisted of demands for cinders as a base aggregate and for asphalt paving after processing by crushing. He stated that there was a market for these cinders in logging operations but on cross-examination he admitted that he did not know of any sales of cinders for use on logging roads, nor did he indicate any knowledge as to whether cinders would be used in these operations if there was a supply in the area. Essentially, Mr. Barnes' testimony was based upon the *prospective* uses to which the cinders from the Buckeye Butte cone could have been and would have been put had the state not taken it for highway purposes.

An effort was made to establish that there was a market in the surrounding area particularly in the town of Chemult which had a population of approximately 150 people. But here again the evidence related to possible uses and not to any substantial present demand for cinders. Even assuming that the evidence showed a present demand there was no proof as to the

quantity of cinders which could be sold for the purposes indicated. The witness admitted that because of transportation costs the cinders in the Buckeye Butte area could not compete with those sold in Klamath Falls and Bend which would be the nearest city markets outside of Chemult.

It was brought out on cross-examination that Weyerhaeuser Timber Company had used cinders extensively on their logging roads in the area but that these cinders came from their own pits and consequently that company did not constitute a part of the market. Mr. Barnes stated that there would be a sale to private road contractors, for use as road materials, although here again the testimony was in terms of how the cinders *could* be processed and used and not in terms of any demand for them at the time of the taking.

Mr. Kelley, a retired civil engineer and former employe of the State Highway Department testified on behalf of the defendants. He testified that the logging of the timber in the vicinity of Buckeye Butte would require the construction of logging roads and that it would be far more economical to use cinders as road materials than any other materials in the area. He stated that the cinders could also be used for railroad ballast, private parkings and driveways, aggregate for roofing, and ornamental tile, and for numerous other purposes. Mr. Kelley was able to testify more specifically as to the actual use of cinders on logging roads and railroads in the area. In 1925 he supervised the construction of a railroad and in 1928 a logging road, both of which used cinders, although they were not in the immediate vicinity of Buckeye Butte. He was not aware of any uses of cinders for private road purposes in 1951 when the defendants' cone was appropriated by the state. Nor could he mention the use for any other

purpose at that time in the surrounding area. The following testimony reveals the principal basis for Mr. Kelley's estimate of value:

"A. \* \* \* I based my valuations on the intrinsic and inherent values that were there, the latent values. It is a natural resource, and I have observed in my activities with the State Highway Department and with construction industries that the natural deposits for road materials are being depleted very rapidly, and that tendency has been going on as far as I can remember. We used to go out and buy good gravel for a cent and a half a yard, and of course the State, they have the power of eminent domain, they don't buy it that way. But anybody else that does, they have got to pay the market price and that ranges all the way from five to thirty-five, sometimes as high as fifty cents a yard for materials.

"Q. Do you know of any cinders that have been sold for any price like that in the vicinity of Chemult to the State or anybody else?

\* \* \* \* \*

"A. Well, I couldn't answer it except by hearsay. I think it could be proved, materials were hauled to private industry down there at the Junction at that filling station and that sort of thing. But the State, by its power of eminent domain, they don't have to buy anything, any materials. They go in and appropriate it.

"Q. How many cubic yards of cinders do you know of being sold in the Beaver Marsh or Chemult area, Mr. Kelley, say in 1951?

"A. I think I have answered that question; I don't know of any.

"Q. And in 1952?

"A. Any time.

"Q. Now earlier in your testimony you stated that these cinders had uses for other purposes than

road construction. Can you tell us what those other uses are in your opinion?

"A. There's countless thousands of yards of materials of a similar character used for railroad ballast. There's many potential uses, driveways, parking areas, roofing aggregate, ornamental tile, concrete products."

Other testimony elicited from Mr. Kelley makes it clear that his estimate of the value of the cone rested heavily upon prospective uses which could be made of the cinders from Buckeye Butte and similar cones in the region.

In determining the present market value of property it is not improper to consider the uses to which the property can be put in the future if the prospect of such uses is more than a speculative forecast and if the probability of such future use would be reflected in the value which a present purchaser would attach to the property. *Five Tracts of Land v. United States,* 101 F 661 (3d Cir. 1900); *Decatur Park Dist. v. Becker,* 368 Ill 442, 14 NE2d 490 (1938).

As stated in *United States v. 620.00 Acres of Land, Etc.,* 101 F Supp 686, 690 (D. C. Ark. 1952):

"* * * To warrant the admission of testimony as to value for purposes other than that for which it is actually used, however, regard must be had for the existing conditions and wants of the community, or such as may reasonably be expected in the immediate future."

To the same effect is *Morton Butler Timber Co. v. United States,* 91 F2d 884 (1937); *Pruner v. State Highway Com'r.,* 173 Va 307, 4 SE2d 393 (1939). It is not enough to show that prospective uses are within the realm of possibility; they must be shown to be reasonably probable in the immediate future. *Olson v. United States,* 292 US 246 (1934); *State Highway*

*Commission v. Brown*, 176 Miss 23, 168 So 277 (1936);
*A. D. Graham & Co. v. Pennsylvania Turnpike Com'n.*,
347 Pa 622, 33 A2d 22 (1943); *Norfolk & W. Ry. Co. v.
Davis*, 58 W Va 620, 52 SE 724 (1906); 1 Orgel on
Valuation Under Eminent Domain (2d Ed) § 31.

It is for the jury to decide whether the prospective
use is reasonably probable, assuming of course, that
there is evidence upon which to base such an inference.
*United States v. Waterhouse*, 132 F2d 699 (9th Cir.
1943).

■ In the present case there was some evidence of a
very limited use of cinders in the vicinity. The bulk
of the testimony related to the future demand for cin-
ders and cinder products and much of it was little more
than speculation. The fact that cinders had been used
and were being used on logging roads and for railroad
ballast at least established that the use of cinders for
private purposes was not fanciful. Consequently, the
jury could have concluded that the development of the
logging industry in the area, the Southern Pacific Com-
pany's diminishing reserves of railroad ballast and
other indications suggesting a developing market for
cinders, were sufficient to constitute an influence on
the value of property in a present market. Although
we would be inclined to discount these propects as ma-
terial factors in creating a present market for cinder
cones in that vicinity, we do not regard the evidence
negativing a market sufficiently clear to preclude the
jury from its function. *Sanitary District v. Loughran*,
160 Ill 362, 43 NE 359 (1896). We find ourselves in
much the same position as the court in *United States
v. Rayno*, 136 F2d 376, 378 (1st Cir 1943), where the
facts parallel those in the instant case. There the court
said:

"But the mere physical presence of hardpan on

the property involved herein is not enough to show that the property was available for use as a source of supply of the material. It is of no use as a source of supply unless there is a market for it and the market for a material like hardpan is necessarily a limited local one. The reason for this is that the supply of hardpan is more than adequate to meet the demand; it is not a material dealt in as a commodity after severance from the land on which it is found; and, due to these factors and to its weight and bulk, it cannot economically be transported any great distance from the place where it is found to the place where it is to be used.

\* \* \* \* \*

"There was evidence, however, of some market for Rayno's hardpan aside from the market created by the construction of the dam. It appears that during the two decades before this proceeding was begun some of it had been used for surfacing a few tennis courts in the neighborhood and for the construction of a few miles of rural road of the clay-chloride type, a use for which it was not too well adapted. It does not appear that any charge was made for the material taken for these purposes but undoubtedly some charge might have been made, and under these circumstances we cannot say that error of law was committed in permitting the jury to find from the evidence that a market for Rayno's hardpan existed aside from the market created by the Government's flood control project at Franklin Falls."

The jury's verdict in condemnation cases ordinarily is not disturbed. *City of Winchester v. Ring*, 312 Ill 544, 144 NE 333, 36 ALR 520 (1924); *Longstreet v. Town of Sharon*, 200 Iowa 723, 205 NW 343 (1925); *Bell's Committee v. Board of Education*, 192 Ky 700, 234 SW 311 (1921); *Interstate Power Co. v. Anaconda Co.*, 52 Mont 509, 159 P 408 (1916). We would not disturb

the verdict in this case had there not been error requiring reversal.

The plaintiff assigns as error the trial court's refusal to recognize one of plaintiff's witnesses, M. J. Holbrook, as a person qualified to testify as an expert with respect to the value of the property taken.

■ It is admitted that the determination of a witness' qualifications as an expert rests within the sound discretion of the trial court. *Tuite v. Union Pacific Stages, Inc.,* 204 Or 565, 284 P2d 333 (1955); *Douglas County v. Myers,* 201 Or 59, 268 P2d 625 (1954). However, the exercise of that discretion may be reviewed on appeal. *Tuite v. Union Pacific Stages, Inc.,* supra; *Timber Srtuctures v. C. W. S. Grinding & Machine Works,* 191 Or 231, 229 P2d 623, 25 ALR2d 1358 (1951); *Stonebrink v. Highland Motors,* 171 Or 415, 137 P2d 986 (1943).

Mr. Holbrook attempted to qualify as an expert upon the basis of the following data presented on direct and cross-examination.

He described his occupation as that of real estate consultant and appraiser. He has been a licensed real estate broker since 1942. He is a member of the American Institute of Real Estate Appraisers and the Society of Residential Appraisers, and had served as an instructor for both of these organizations in teaching courses given under the auspices of the University of Southern California, Stanford University, Northwestern University and Michigan State University. He also taught for other trade organizations and conducted courses of his own. He is also a member of the Institute of Real Estate Management, the Institute of Real Estate Counselors and other trade societies of this nature. He majored in economics in college. After entering

his present occupation he took specialized courses in appraisal given by the management and appraisal institutes mentioned above and by others such as the American Realty Association and the American Society of Appraisers, of which he was also a member.

As an employe of General Petroleum Corporation he had experience in acquiring service station sites, one of which was in the city of Klamath Falls. He had appraised various types of real estate in 22 states and in Canada, Alaska and Hawaii. These appraisals were made for a variety of employers including lawyers, banks, title companies, cities, port authorities, state agencies, including the highway departments of Oregon, Washington and California, and numerous federal agencies. Some of these appraisals were made to establish market value of property being taken in eminent domain suits.

With respect to his qualifications to appraise the cinder cone in question he testified as follows:

"A. In the general category of road building deposits, being rock and rock aggregates, in the Columbia River Valley I have appraised the Cathlament; the purpose of the appraisal was to determine the price which the State of Washington would pay for the property. I have appraised * * * the pit rights between Vancouver and Camas for the purpose of acquisition of the property by the State of Washington. * * * for the Port of White Salmon for the purpose of determining the amount they should pay in the acquisition of a rock quarry site.

　　*　　*　　*　　*　　*

"A. * * * at Moser, Oregon for the State of Oregon for the purpose of acquiring a quarry site; * * * at Camas, Washington for the State of Washington for the purpose of acquiring a cin-

der pit. * * * for the State of Oregon at a point approximately midway between LaGrande and Baker for the purpose of acquiring a cinder cone. * * * for Dant & Russell on the Deschutes River a pearlite operation for the purpose of sale and the conduct of the sale. * * * for the State of Oregon in the Chemult area and northerly of that to Crescent approximately three or four pumice deposits for the purpose of purchasing those pumice deposits.

* * * * *

"A. * * * I have appraised four cinder deposits in the Roseburg area for the State of Oregon for acquisition; * * * two cinder deposits in the Territory of Hawaii for the purpose of sale by the Territory of Hawaii. Those would be generally representative of the type of work.

Oh, I have appraised, just recently appraised a pit site in Olympia, Washington for the owners of that pit site in consummating a sale of that site. I have appraised for the Starr Sand and Gravel Company at Longview for the purpose of selling the pit site at Longview.

* * * * *

"A. * * * I have appraised in the city of Klamath Falls various properties for the State of Oregon for the purpose of acquisition."

The witness made an examination of Buckeye Butte and stated that he was familiar with it and with the property values in the vicinity. He personally examined the cinders which were taken from the cone to judge their fitness for road building and road repair purposes, and he also read the reports on the quality of the cinders made by two commercial testing laboratories and by the State Highway Department's geologists and engineers. According to his testimony, he obtained his estimate of the quantity of cinders in the

cone by his own observations with the aid of calculations made by the State Highway Department.

He obtained information from various sources concerning the market for cinders. He interviewed other producers of cinders, investigated the markets each served and the use to which the materials were put including the use for railroad ballast, existing logging roads in the area, and other uses. He investigated the freight rates from shipping points in the area of Buckeye Butte to various points on the Pacific coast. He consulted public records and discussed with qualified brokers the sale, use and leasing of cinder cones and cinder products within the area. He stated that he investigated the feasibility of operating the property in the production of cinders and cinder products and by-products, their transportation, the labor problem, the length of time the operation could economically continue, the potential sale of products from the site, and other factors relating to the market for the property in question.

At the conclusion of the effort to qualify Mr. Holbrook as a witness the trial judge concluded:

"Oh, I don't believe this man is qualified to testify as an expert. He knows nothing of the lands of Klamath County or in this vicinity. The fact he sold a piece of property or he appraised a piece of property for the petroleum company down here in the City of Klamath Falls sometime ago, that certainly isn't qualification. Whatever he knows as to the intricate makeup of these cinders he got from the State of Oregon, it is hearsay evidence as far as he is concerned. He can testify as an ordinary witness but not as an expert."

At another point the trial judge said:

"I don't think he has qualified as a mineral ex-

pert any place by this testimony. I don't think he has ever tried to qualify himself as a mineral expert. In this locality he has examined or he has appraised a piece of property for the General Petroleum Company."

We are of the opinion that Mr. Holbrook should have been permitted to testify as an expert and that the trial court's refusal to permit him to do so constitutes reversible error. The trial judge stated that the witness had not "qualified as a mineral expert." It was not necessary for him to do so. He was called to give testimony with respect to the value of the condemned property. To establish such value it was not necessary that he have scientific knowledge of the minerals which were being taken.

It is possible that the trial judge simply meant to say that the witness had insuffiicent knowledge of the market for cinder cones and cinder products and was not a "mineral expert" in that sense. Inasmuch as the witness had made appraisals of other cinder cones the trial judge's objection would not have merit unless it could be taken to mean that in the particular area the witness had insufficient knowledge of the market for such property.

This brings us to a consideration of the test for determining whether a witness qualifies as an expert for the purpose of testifying as to the value of property.

■ It has been said that an expert is one who has acquired "certain habits of judgment, based on experience or special observation." *Kelley v. Richardson,* 69 Mich 430, 37 NW 514 (1888). Because of these qualifications he is permitted to express his opinion as a witness so that the jury may have the benefit of his special ability to draw inferences from the facts in evidence.

"The expert witness is granted the privilege of expressing to the jury an opinion because his superior training enables him to arrive at a conclusion which is more likely to be sound than that of the average juror." *Lippold v. Kidd,* 126 Or 160, 164, 269 P 210, 211, 212 (1928). We have held that no special training or study is necessary to enable one to estimate the value of property. *Douglas County v. Myers,* 201 Or 59, 268 P2d 625 (1954). This is not to say that a knowledge of the valuation process is immaterial in the appraisal of property and in determining whether a witness as to value qualifies as an expert. The appraisal process calls for an understanding of the economic and social concepts relating to value. Competent appraisers acquire knowledge of the factors important in arriving at the value of property. They apply certain techniques in appraising property, and many of these techniques can be regarded as fundamental tools, useful in the appraisal of all kinds of property. See Selected Readings in Real Estate Appraisal. The skill of a professional appraiser analyzing and interpreting these factors and in applying these techniques is not unlike the skill of others who are accepted without question as experts by the courts.

It has been said that "The courts do not appear to recognize the existence of any generalized knowledge of valuation processes or appraisal methods that is independent of knowledge of particular transactions and of particular property." 1 Orgel on Valuation Under Eminent Domain (2d ed), § 134. We think that there is such "generalized knowledge" and that it is to be weighed in determining whether the witness qualifies as an expert.

In the present case witness Holbrook attempted to apply his knowledge of the appraisal process in esti-

mating the property in question. In doing so he investigated various factors which he thought reflected upon the market value of the property, e.g., the quantity and quality of the deposit, the means and cost of transporting the materials, the existing demand for cinders for railroad ballast, logging road surface and other uses. In making this investigation he obtained information from various sources, some of which was clearly hearsay. The defendants argue that expert opinion cannot be based upon hearsay, relying upon *Tuite v. Union Pacific Stages, Inc.*, 204 Or 565, 284 P2d 333 (1955), which in turn relied upon *Henderson v. U.P.R.R. Co.*, 189 Or 145, 219 P2d 170 (1950) where it was said: "* * * that 'no allegation can be proved by the *ipse dixit* opinion of any expert unless the facts or phenomena upon which he bases his opinion are disclosed either by his own testimony or that of other witnesses.'" 189 Or 145, 167, 219 P2d 170, 180. Certainly it cannot be contended that the expert witness is wholly precluded from relying upon hearsay evidence because it is recognized that a considerable part of the knowledge which makes one an expert whether he be doctor, lawyer or appraiser, is obtained from books and other hearsay sources. *Scott v. Astoria Railroad Co.*, 43 Or 26, 72 P 594 (1903); 2 Wigmore on Evidence (3d ed) § 665(b). The defendants, however, argue that the witness' sole claim to expertise in this case was based upon hearsay evidence because his knowledge of the values of roadbuilding material in other vicinities was of no value to the jury in this case.

We recognize that the witness must know the market value of the property and that this means a knowledge of the value in the vicinity. 3 Wigmore on Evidence (3d ed), § 718. The witness had appraised similar property in Oregon and elsewhere. As stated

by Wigmore, supra, the question is "how far an acquaintance with value—standards *in one place* will suffice when the value in question is of a thing *in another place.*" He concludes that "the witness' competency must here depend upon whether the condition of value in the two places are sufficiently similar to render his knowledge of values in one place adequate for estimating them in the other. The application of this principle must depend on the circumstances of each case and no further detailed rules can be laid down."

We think that one of the circumstances is the character of the property being appraised. The property may be such that an intimate knowledge of the character of the community would be necessary to estimate the value in a free market. Thus an understanding of the buying habits of the residents in the community, their financial resources, the economic conditions in the area and other knowledge which would reflect upon the interplay of the forces of supply and demand, might be very significant if the witness were called upon to appraise a business site in the community. A less detailed knowledge would be necessary where the thing to be evaluated has a limited market, such as a steam shovel or a road grader. We think that a cinder cone falls into this latter class.

It is apparent from the evidence that there is a limited market for such property and for the materials which are produced from it. It would not appear that Mr. Holbrook's knowledge of the demand for cinders for various uses including railroad and logging road purposes would have been enhanced substantially by his residence in or more intimate knowledge of other property values in the vicinity. If an appraisal is based upon something more than intuition, the appraiser must make inquiry into the various forces

which influence the price of the property and, where the property is a type which is not often sold, the burden of inquiry would be almost as heavy on an appraiser who was acquainted with the community as one who was called in from the outside. The opinion of a professional appraiser under circumstances such as are present in the instant case is likely to be of far greater value in assisting the jury than that of a real estate broker who ordinarily would have little basis for fixing a value on property of the special nature involved here.

Turning to the contention that Mr. Holbrook's opinion was based upon hearsay, we may observe that there is ample authority for the proposition that opinion as to value may be based, at least in part, upon hearsay evidence. *United States v. 5139.5 Acres of Land*, 200 F2d 659 (4th Circ. 1952); contra, *United States v. Katz*, 213 F2d 799 (1st Cir. 1954) cert. den. 348 US 857 (1954); *George v. Bekin Van & Storage Co.*, 196 P2d 637 (Cal App 1948) affirmed as modified 33 Cal2d 834, 205 P2d 1037 (1949); *Hammond Lumber Co. v. Los Angeles County*, 285 P 896 (Cal App 1930); *Gulf Refining Co. v. Smith*, 164 Ga 811, 139 SE 716 (1927); *Johnson v. City of Lowell*, 240 Mass 546, 134 NE 627 (1922); *National Bank of Commerce v. New Bedford*, 175 Mass 257, 56 NE 288 (1900); *Owens v. Oklahoma Turnpike Authority*, Okla, 283 P2d 827 (1954), appeal dismissed 350 US 893 (1955); *Davis v. Southern Surety Co.*, 302 Pa 21, 153 A 119 (1930); *Eisenhart's Estate*, 71 Pa D & C 392 (1950); *United Fuel Gas Co. v. Allen*, 137 W Va 897, 75 SE2d 88 (1953); Nichols on Eminent Domain (3d ed) § 18.42. There is respectable authority that an expert may testify as to value even though his conclusion is based entirely upon hearsay. *H. & H. Supply Co. v. United*

*States*, 194 F2d 553 (10th Cir 1952) ; *Finley v. Board of County Commissioners*, Okla, 291 P2d 333 (1955).

We think that an expert witness' opinion as to value should be received even though it is based in part upon statements or reports of others, as it was in the present case, if the jury is informed of the source and character of the information upon which the witness draws his inferences.

We have held that an expert cannot give an opinion unless the facts upon which his opinion is based are disclosed by his or other witnesses' testimony. *Henderson v. U.P.R.R. Co.*, supra. We regard this as a salutary principle because it permits the jury to judge the weakness or strength of the premises upon which the witness bases his conclusion. We regard this principle as applicable in cases in which the witness is called upon to testify as to value. We wish to make it clear that what we have stated here concerning the admissibility of testimony of expert witnesses as to value is not intended to modify in any way the rules previously announced by this court relating to the testimony of experts called to testify in other types of cases such as in *Tuite v. Union Pacific Stages, et al*, supra; *Henderson v. U.P.R.R. Co.*, supra, and *Lippold v. Kidd*, 126 Or 160, 269 P 210, 59 ALR 875. Those cases did not involve the testimony of expert witnesses testifying as to value, and the rules stated with respect to the testimony of the type of witness involved in those cases are in no way modified by this opinion.

It is possible, of course, that even with the aid of information obtained from hearsay sources that the witness does not have sufficient knowledge of the property which he is asked to evaluate. In such case he does not have enough to offer the jury to make his testi-

mony worth admitting. *Oregon Pottery Co. v. Kern*, 30 Or 328, 47 P 917 (1897).

■ The concurring opinion expresses the fear that if the expert witness is permitted to present to the jury hearsay sources as a basis for his opinion the jury will "accept as true a premise unestablished by competent evidence." This objection has been expressed in other cases. McCormick on Evidence, p 33, § 15, answers the criticism as follows:

> "* * * It seems arguable that an expert in a science is presumably competent to judge of the reliability of statements made to him by other investigators or technicians. He seems just as competent indeed to do this as a judge and jury are to pass upon the creditibility of an ordinary witness on the stand. If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced when the opinion is bounded not only upon such reports but also in part upon the expert's firsthand observation. The data of observation will usually enable the expert to evaluate the reliability of the statement."

We think that the reasoning employed by McCormick also applies where the expert witness is testifying as to value. In stating that the expert witness in testifying as to value may base his opinion in part upon hearsay it is not intended to assert that he may do so in all cases. The limits upon the use of such evidence is well stated in 58 Yale Law Journal 1242, at p 1263, as follows:

> "Where an opinion is not to be confined to the interpretation of specified data already in evidence, the question of how far an expert may go again

depends on the multiple factors of (a) the scope of his expertness, (b) the apparent validity of such hearsay information as he may profess to take into account, and (c) the extent to which the premises for his inferences are based on his own study, experience, and observation, rather than on specific information supplied by other witnesses or evidence in the case. An expert representing a recognized and trusted discipline or science may base conclusions on his general background of study and observation, including the reported data of fellow scientists and technologists, despite its hearsay character. But if the scope of the expert's qualification—or the status of the special discipline which he represents—falls short, then he is likely to be confined to the interpretation of specified data already in evidence."

◼ The concurring opinion interprets the foregoing statement as opposed to the view which we have advanced, apparently because Mr. Holbrook is not "an engineer or a mineralogist or a scientist of any sort." It is difficult to understand how this would put him outside of the operation of the rule referred to in the passage permitting experts to use reported data of others. A perusal of the journals published by the appraisal profession makes it clear that the qualified members of that profession must have a rather extensive and technical knowledge in their field. It is not unlike the type of special knowledge which elevates other recognized specialists into the class of experts. The concurring opinion apparently would not regard a qualified professional appraiser as "an expert representing a recognized and trusted discipline" referred to in the quoted passage above. We, on the other hand, think that a professional appraiser with proper experience and training (which Mr. Holbrook has according to the evidence) is entitled to that status.

An expert on value is, within his own discipline, just as much entitled to draw upon other experts as does a doctor, engineer or scientist, if the appraiser is not evaluating the scientific verity of the testimony he relies upon and simply uses it along with other data and knowledge as a basis for performing his expert function in arriving at a figure representing value. The safeguards against abuse in the use of such evidence are stated in the quotation above. In addition to such limitations, there is the safeguard of cross-examination through which the adversary may expose the unreliability of the hearsay sources relied upon and thus weaken the support upon which the opinion rests.

Our view on this matter is not foreign to the common practice of permitting appraisers in the trial of condemnation cases in this state to use hearsay sources in testifying as to value.

In the instant case the witness Holbrook examined the property in question; he was acquainted with this special class of property through his previous experience in appraising cinder cones elsewhere. He was aware of the fact that the quality of the cinders was relevant in judging their value for road surfacing and other purposes and in arriving at his conclusion in this respect he relied in part upon the findings of testing laboratories. These findings were testified to directly by Albert Wahto, an engineer employed by one of the laboratories so that the jury had before it the factual basis upon which Holbrook formed his opinion as to the suitability of the cinders for various uses. Even though Mr. Wahto or the other testing engineers had not been called to testify Holbrook would have been entitled to testify as to the value of the cone, basing his opinion in part upon the disclosed reports of laboratories.

■ It is our conclusion that Holbrook had sufficient qualifications to give his opinion as an expert on the property he was called upon to appriase and that he should have been permitted to testify. It is possible that if his testimony had been heard by the jury the verdict would have been more favorable to the plaintiff. We hold that the exclusion of his testimony was reversible error.

The plaintiff requested the following instruction:

"I instruct you that the very purpose of reserving in the people the power of eminent domain is to prevent an owner of a site especially available for a public use, but not of great value for other purposes, from trading upon the necessities of the public when it is sought to acquire his land for public use, and from compelling the public to pay for his land whatever figure he may name. The market value of land peculiarly adapted for public use is its value apart from such adaptability."

■ We believe that the condemnor is entitled to an instruction which warns the jury against including in the market value of the property taken the peculiar value to the taker. The danger that the jury, out of sympathy for the owner, may award damages where they do not exist justifies the properly worded instruction containing the warning. However, as we have already stated above, if the property is available and useful to others for purposes which are the same or similar to those of the condemnor, the value added by the fact that the latter is part of a general market can be included. The requested instruction did not clearly eliminate this latter consideration and was, therefore, properly denied.

■ The plaintiff contends that the court erred in refusing to allow plaintiff's motion to strike the testi-

mony of Barnes, which has previously been referred to, as to the value of the property. The ground for the motion was that the witness based his estimate of value upon an improper method of computation. His estimate was $40,000 to $85,000. This was arrived at by the following method: he assumed that the cinders were worth ten cents per yard (this was the price he had received for cinders from his own cone near Klamath Falls); he multiplied the estimated yardage of cinders in the cone and arrived at the variable figure mentioned above.

The state objects to the computation principally upon the ground that the value of property taken under eminent domain cannot be estimated by multiplying an estimated amount by a fixed price per unit. The defendants admit that the general rule is as plaintiff states it, but they argue that the use of such a method of computation does not constitute reversible error in the present case because (1) one of plaintiff's own witnesses, Mr. Chilcote, used the same method; (2) Barnes estimate of value was based upon considerations other than amount multiplied times the price per unit and this was sufficient to eliminate the speculation element which renders the multiplication method objectionable; (3) the state itself admitted that there were approximately 850,000 yards in the cone and it was shown that approximately 220,000 yards had been removed by the state; consequently the element of speculation was eliminated from the computation in this case.

The defendants' first point is not well taken. The state's witness did not use the objectionable method of computation in arriving at the market value of the property. He stated that the cinder cone as such had no market value. He arrived at a figure of $322.80 for the property by the multiplication method simply as a

means of getting a figure which could be used in making an award because as he stated, "he knew that the State of Oregon wouldn't get it for nothing." In other words, he stated that he used the objectionable method to arrive at an arbitrary figure but not the market value. This was clearly revealed in his testimony.

On the other hand Barnes definitely used the multiplication method in his estimate, and as far as we can discern from the transcript it was the sole method used by him. Whether or not it was the sole method we are of the opinion that its use in this case is ground for reversal. The evil of the method is not simply the danger of leading the appraiser to an inaccurate appraisal but more important, because it has the illusion of scientific certainty and validity, it is too likely to be grasped upon by the jury as the sole criterion of value even though the expert witnesses in making their estimates purport to eliminate from their computation the element of speculation.

This brings us to a consideration of the objection to the use of the multiplication method. It is to be borne in mind that the property being appraised is not cinders but a part of the land including the physiographical feature known as a cinder cone. It is improper, therefore, to appraise the cone as though it were a depository containing a number of units of cinders. The general principle is stated in McCormick on Damages, p 168 as follows:

> "Where the property concerned is an aggregate of smaller units which may themselves be separately sold its market value is the value of the aggregate and not the sum of the values of the separate units."

The principle is applicable in the appraisal of mineral deposits. *St. Louis Belt and Terminal Railway Co. v.*

*Cartan Real Estate Co.*, 204 Mo 565, 103 SW 519 (1907); *Montana Ry. Co. v. Warren*, 6 Mont 275, 12 P 641 (1887); affirmed 137 US 348 (1890); *Ross v. Com'rs. Palisades Interstate Park*, 90 NJL 461, 101 A 60 (1917); *Reading & P. R. Co. v. Balthaser*, 119 Pa 472, 13 A 294 (1888); *Seattle & M. R. Co. v. Roeder*, 30 Wash 244, 70 P 498 (1902).

■ Where the mineral interest and surface interest are owned by different parties the mineral interest may be valued separately, *Eagle Lake Improvement Co. v. United States*, 160 F2d 182 (5th Cir. 1947), but it must be valued as a segregated part of real property and not as a natural warehouse for minerals as personal property. This is merely another way of saying that the trier of fact is not to think of the property taken as a congeries of separate truckloads or carloads or yards of the mineral which make up the deposit. Nichols, Eminent Domain (3d ed), § 13.22; Horgan, Mineral Valuation in Eminent Domain Cases, 7 Hastings L J 163, 165 (1956). Consequently, it is improper to estimate the value of the property by toting up the estimated profit from the estimated sales of the separate units. *Sanitary District v. Loughran*, 160 Ill 362, 43 NE 359 (1896); *Kansas City v. Bacon*, 157 Mo 450, 57 SW 1045 (1900); *Sparkill Realty Corp. v. State of New York*, 268 NY 192, 197 NE 192 (1935); Orgel, §§ 161, 162. This is clearly stated in *United States v. 13.40 Acres of Land in City of Richmond*, 56 F Supp 535, 538 (D.C. Cal. 1944):

"* * * Both [appraisers] appraised the land upon the basis of returns inuring to the defendants out of future sales of the rock material. Both made inquiries and investigations with respect to the production, transportation and sale of rock material. Predicated thereon, they estimated the selling price

in the future of the rock material and then made deductions by way of expenses for blasting, trucking, general operating expenses, allowance for risks and other unforeseen business contingencies and then, upon that concept, proffered their opinions as to the market value of the property. *What they really did was to appraise the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself as of the date of the taking.* Such a modus of evaluation is not according to proper standards or criteria legally approved in the determination of market value."

The reasons for rejecting valuations arrived at by the multiplication method are summarized in *United States v. Indian Creek Marble Co.*, 40 F Supp 811 (D.C. Tenn. 1941):

"Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just

compensation. No man of business experience would buy property on that theory of value. True it is that quality and quantity have a place in the mind of the buyer and the seller, but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent. Values fixed by witnesses on such a basis are practically worthless, and should not be accepted. *To the extent the valuation fixed by any witness contains this speculative element, to the same extent is its value as evidence reduced.*" (Emphasis supplied). 40 F Supp 811; 822.

See also *United States v. Meyer*, 113 F2d 387 (7th Cir 1940); *United States v. Rayno*, 136 F2d 376 (1st Cir 1943); *United States v. 5 Acres of Land, Etc.*, 50 F Supp 69 (D.C. NY 1943); *United States v. Certain Lands Located in the Towns of, Etc.*, 52 F Supp 314 (D.C. NY 1943).

In the case at bar the jury was instructed that "nothing shall be allowed for prospective value or expectative value, or such value based upon future expenditures and improvements." This was not sufficient to avoid the danger of misleading the jury by the use of the improper method of evaluation. Although there may be cases in which the use of the improper method of evaluation should be regarded as affecting only the weight of the evidence, *Sanitary District of Chicago v. Loughran*, 160 Ill 362, 43 NE 359 (1896), we think that the admissible evidence of market value in the instant case was not strong enough to eliminate the danger of distorting the verdict through the use of an erroneous and speculative theory. *United States v. 620.00 Acres of Land, Etc.*, 101 F Supp 686 (D.C. Ark 1952).

In the case at bar the state had removed 220,000 yards of cinders prior to trial of the cause. Assuming

that the unit price of ten cents used by defendants' witnesses in computing their estimates was the market price for cinders in the immediate vicinity of the property taken and that there was a market for that quantity of cinders (other than the market created by the needs of the state) the verdict of $13,250 would not seem unreasonable. But we do not know whether the jury based its verdict on a finding that there was such a market or simply on a calculation of quantity multiplied by a price per unit, assuming that because the state needed and used the cinders it should pay for them irrespective of the absence of a market for them. The evidence in this case did not establish the quantity of cinders that the market in the vicinity could absorb. *Sparkill Realty Corp. v. State*, 268 NY 192, 197 NE 192 (1935). If the jury had been properly warned against the use of speculative calculations and of forecasts of future demands based upon surmise, it is possible that they would have found the market value to be considerably less than the verdict returned in this case. The state was entitled to have the warning given.

We hold, therefore, that the plaintiff is entitled to have the question of market value resubmitted to the jury free from any testimony based upon the above described erroneous method of appraisal.

For the foregoing reasons the lower court is reversed and the cause remanded for a new trial.

PERRY, J., specially concurring.

I concur generally in the law of the case as expressed in the opinion of the majority. However, I must disagree with the obiter dictum expressed as follows:

> "Even though Mr. Wahto or the other testing engineers had not been called to testify Holbrook would have been entitled to testify as to the value

of the cone, basing his opinion in part upon the disclosed reports of laboratories."

Certainly, there are many situations in the law where hearsay evidence must be admitted because the law cannot insist upon impossible standards, but this is not one of them. Under this statement, through the guise of an exception to the general rules governing hearsay evidence, there is admitted for the consideration of the jury the opinion of another expert which may not be tested by cross-examination. The jury is thus permitted to accept as true a premise unestablished by competent evidence and which relates directly to the quality of the product whose value is in dispute.

The fallacy of such a procedure must, it seems to me, be at once apparent, for the jury, in order to evaluate the opinion of the expert on value, must of necessity evaluate the premises upon which the opinion is based.

While I concur in the result, I must dissent from this expression of the majority and any other language in the opinion that can be interpreted as enlarging the general rules of law relating to hearsay evidence. Even if I was disposed to enlarge the exceptions to the hearsay rules which are designed to cause a judgment to be rendered upon facts and not rumor, the authorities relied upon by the majority do not extend the enlargement as far as the majority would infer it should be extended.

The excerpt from 58 Yale Law Journal 1242, 1263, so far from supporting the opinion is opposed to it. The writer there says that experts representing a recognized and tested science may base conclusions on "the reported data of fellow scientists and technologists, despite its hearsay character." He concludes "but if the scope of the expert's qualification * * * falls short, then he is likely to be confined to the interpreta-

tion of specified data already in evidence." The cases cited for the exception to the general rule, relied upon in McCormick on Evidence, p 33, § 15, are all to the same effect.

Since Mr. Holbrook, although a competent real estate appraiser, is not an engineer or a minerologist or a scientist of any sort, he would be confined in his testimony in the manner indicated by the author of the Yale Law Journal article.

## ON REHEARING

On appellant's petition for rehearing.

82

Robert Y. Thornton, Attorney General, and L. I. Lindas and Charles Peterson, Assistant Attorneys General, Salem, Oregon, for the petition.

Before McAllister, Chief Justice, and Perry, Sloan and O'Connell, Justices.

O'CONNELL, J.

The Commission requests us to reconsider its second assignment of error and to modify our former opinion by holding that in the evaluation of property taken by eminent domain the condemnor's demand for it should be disregarded entirely.

In our former opinion we said that "If the state's need for the property is in competition with other similar demands for it the state's participation in the market may be considered in arriving at the value of the condemned property." We had in mind the situations where the condemnor's demand for the property along with the demands of others created its value in the market. Thus, if the owner of a gravel pit is selling gravel by the yard at three dollars per yard to a variety of customers including the state, its participation in the market influences the price as does the demand of all the others because theoretically at least each separate demand has an influence upon the price. In such circumstances there would be no more reason for disregarding the condemnor's demand than for disregarding the demand of any other customer. In most cases the fact that the condemnor has a need for the property distorts the price which the seller asks. This danger of distorting the price is the reason which prompted the rule forbidding the consideration of value to the taker. We did not feel that the state was entitled to assume in *every* case that its demand for

the property would necessarily cause such distortion. We relied upon several cases to support our position. *Oregon R. & Nav. Co. v. Taffe,* 67 Or 102, 134 P 1024, 135 P 332, 135 P 515 (1913); *United States v. Boston, Cape Cod & N. Y. Canal Co.,* 271 F 877 (1st Cir 1921); *Olson v. United States,* 292 US 246, 54 S Ct 704, 78 L Ed 1236 (1934); *Mississippi & Rum River Boom Co. v. Patterson,* 98 US 403, 25 L Ed 206 (1878). The appellant-petitioner argues that these cases are not in point because they hold only that the value of the property may be based upon the highest and best use. But in those cases the courts were concerned with the use for which the *condemnor* sought the property and it was the *condemnor's demand* for the property for such use that increased the price. The effect of the holding in those cases was that the condemnor's demand, although contributing to the price, could be considered in arriving at the value to be paid by it.

■■ We are convinced that the view we took of the matter in our former opinion was consistent with economic theory and with the basis for the rule excluding value to the taker in arriving at the condemnee's award. However, upon a re-examination of the problem we have concluded that out of practical considerations the position we took in our original opinion must be modified. In most of the cases in which a condemnation suit is brought the condemnor has not participated in the market. Where the property taken consists of a natural resource such as a gravel pit or a cinder cone whose value is arrived at in part at least by considering the market for the materials which make it up, the condemnor may participate in the day to day demand for such materials as other purchasers do and thus influence the price without distorting it. But normally it will not condemn if it can purchase in this

manner. And, of course, where the property is not taken for the materials which can be extracted from it the condemnor would very seldom play any part in the market whatsoever. In most cases, then, the failure to exclude the value to the taker in making an appraisal would be an error. In view of this fact the question is whether the possibility that the condemnor's demand might not have distorted the price should be provided for in formulating a rule governing the use of appraisal evidence in the trial of condemnation cases. We now think that the rule should not be so formulated. Our reasons are as follows. Considering the paucity of situations in which the condemnor's demand affects the normal market price we think that there would be few instances in which there would be any danger that the exclusion of the condemnor's demand would produce an unfair award to the condemnee. Weighed against this slight danger is the practical difficulty of drawing the line between the demands of the condemnor as a participant in the general market which establishes the normal market value and its demands which distort the price. The jury would be invited to speculate in an area which already is not only complicated and confusing to the average person but to economists as well. "* * * the issues should be submitted so as to avoid confusing the jury as much as possible." *City of Austin v. Cannizzo,* 153 Tex 324, 267 SW2d 808, 812 (1954). *State v. Carpenter,* 126 Tex 604, 89 SW2d 194, 89 SW2d 979 (1936). There is a widespread belief that in the trial of condemnation cases juries usually return verdicts in excess of the value of the property taken. Graubart, "Theory Versus Practice in the Trial of Condemnation Cases", 26 Penn Bar Assoc Quarterly 36 (1954). If this is true the disadvantage to the condemnor can, to some extent, be mitigated by a rule

which wholly precludes a consideration of the condemnor's demand for the property in arriving at the market value.

We hold, therefore, that in the evaluation of property taken under eminent domain the condemnor's demand for it must be disregarded. In this respect our former opinion is modified. The petition for rehearing is denied.