# IN THE OREGON TAX COURT

## JOSEPH HYDRO ASSOCIATES, LTD.
*v.*
## DEPARTMENT OF REVENUE
(TC 2362)

Laurence F. Janssen, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered August 1, 1986.

**CARL N. BYERS, Judge.**

The property which is the subject of this appeal is a newly constructed electric generating facility. The property was assessed by the Department of Revenue as of January 1, 1985, as a utility in accordance with ORS 308.505.

The property consists of three small hydroelectric power stations with related equipment. Located in Wallowa County northeast of the City of Joseph, the stations all draw their water from an irrigation canal which, after spinning the generators, is returned to the irrigation canal. In addition to the pipes, generators, penstocks and related equipment, there is approximately nine and a half miles of transmission lines which carry the power generated to plaintiff's sole customer, Pacific Power and Light Company. The three stations are designed to produce 7,500 kilowatts at any given moment or approximately 22,500,000 kilowatt hours per year.

The property was initially constructed by Wallowa Hydro Associates, Ltd., an Oregon limited partnership, at a cost of approximately $9,600,000. Upon completion in November 1984, the property was sold to plaintiff for $10,659,000. (Tr 49, at line 19.) As disclosed by the evidence, this was not an arm's-length transaction but a sale made to comply with or obtain benefits under tax and securities laws. Plaintiff has sold some 34 units of limited partnership interests for $149,000 plus assumption of $55,000 in debt for each unit to outside investors. As indicated by the prospectus and emphasized by plaintiff in its evidence, substantial income tax credits flow to the owners and "first users" of the project. It is largely these tax credits which create the dispute between the parties as to the value of the property.

Plaintiff's property is subject to assessment as a designated utility by the Department of Revenue under ORS 308.505 to 308.665.[1] The assessment goal is "true cash value"

---

[1] ORS 308.510(1) provides:

"'Property,' as used in ORS 308.505 to 308.660 and 308.705 to 308.730, includes all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service or in a sale of any commodity, as set forth in ORS 308.515, whether or not such activity is pursuant to any franchise and includes but is not limited to the lands and buildings, rights of way, roadbed, water

of the property. That term is defined in ORS 308.205 as follows:

> "True cash value of all property, real and personal, means the market value of the property as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

> "(1) If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property."

The term "immediate market" has been interpreted by the Department of Revenue to mean existing sales of comparable properties, thereby enabling use of the market data or market comparison approach.

> "When the market data approach is not applicable, true cash value shall be determined by estimating just compensation for loss to the owner of the unit of property." OAR 150-308.205-(A)(1)(b).

The rule further provides that the other two approaches to value are the cost approach and the income approach.

In this case plaintiff has relied entirely upon the income approach. Plaintiff's evidence was presented through two witnesses. The first witness, Mr. Richard Norman, is an expert experienced in the economic aspects of such projects, being one of the principal persons to conceive, create and market this and similar projects. He explained that the income tax benefits flowing to the limited partners is a major consideration for the purchase and construction of the facility. As observed in plaintiff's brief, at 27:

> "During the first five years of the project, each Limited Partner was projected to receive federal and state tax benefits

---

powers, vehicles, cars, rolling stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels; but does not include items of intangible property that represent claims on other property including money at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by mortgages, and all shares of stock in corporations, joint stock companies or associations."

(primarily, the tax credits) approximating $172,850 on a cash investment of $149,000. For the comparable period, cash flow from operations was projected at only $13,450."

Mr. Norman further indicated that the substantial income tax credits were available only to the "first user" of the property. Since plaintiff commenced use of the property early in November 1984, it qualified as the "first user." However, Mr. Norman reasoned that since a prospective or hypothetical purchaser as of January 1, 1985, would not be entitled to the income tax credits, the market value of the property would be substantially less than its cost. Utilizing the income approach, Mr. Norman estimated the value of the subject property at "somewhere between $4.2 million and $4.8 million."

Plaintiff's second witness was Mr. James Cegelski, a qualified appraiser who had some experience in appraising energy-creating properties. Also relying on the income approach, Mr. Cegelski determined that, even under the most favorable circumstances, the projected income from the project would not justify a value greater than $5,700,000. This estimate of value also assumed, as did Mr. Norman's, that none of the income tax credits would be available to a prospective purchaser. However, when it developed on cross-examination that a prospective purchaser would be entitled to the remaining 25 percent state energy income tax credit, as well as the $12,500 federal investment tax credit for used property, Mr. Cegelski estimated that the value of the property under those conditions would be approximately $8,000,000. (Exhibit 13.)

Defendant's appraiser, Mr. Roger Maude, relied entirely on the cost approach. Mr. Maude testified that because of the property's specialized nature and its virtually new construction, the cost approach was the most reliable indicator of value. Reasoning that the plaintiff constituted a sophisticated, knowledgeable investor, Mr. Maude opined that plaintiff's purchase of the property, whether as a sale or by construction, constituted an expression of market value. Consequently, Mr. Maude did not attempt to value the property by the income approach or consider the effect of the tax credits.

When asked on cross-examination about the need to

consider that a prospective purchaser would be unable to utilize all of the tax credits that the first user enjoyed, Mr. Maude indicated that the traditional definition of "fair market value" assumes a willing seller as well as a willing buyer. Mr. Maude concluded that the first user of the property would not be willing to sell the property for a price which a prospective purchaser, as second user, would be willing to pay. The problem with this position, as noted by plaintiff, is that the definition of fair market value assumes a hypothetical seller as well as a hypothetical buyer and does not take into account income tax benefits or detriments of the actual owner of the property.

It is necessary here to briefly consider the income tax credits which are the cause of this dispute. As indicated by the investors' prospectus (Exhibit 1), the first user is entitled to federal investment and energy income tax credits equal to 21 percent of the cost of the property and state energy investment income tax credits equal to 35 percent of the cost of the property. The state tax credits are allowed over a period of five years, 10 percent in each of the first two years and five percent during each of the three remaining years.[2] Assuming that the cost of the tangible property qualifying for tax credits is $9,600,000,[3] the total federal and state tax credits would be equal to $5,376,000. The significance of this is made clearer by considering the relationship between debt and equity. Here we have a project which cost $10,659,000, financed by approximately $5,500,000 of debt and $5,100,000 of equity. If the investors or owners realized the full benefit of all of the income tax credits, they would recover within the first five years more than their entire equity investment in the property. Thus it appears that Mr. Norman's testimony that these kinds of projects are "driven" by the income tax benefits is clearly true.

■      Having entered the quagmire of income tax complexity, it is necessary to consider two additional points impacting a determination of true cash value. First, federal tax credits may be recaptured if the first user disposes of the property

---

[2] It should be noted that tax credits are not merely deductions but are direct dollar for dollar offsets against income tax liability.

[3] Although plaintiff paid $10,659,000 for the property, some of that purchase price might be allocated to contract rights and other intangibles which do not qualify for the investment tax credits.

within five years of its placement in service. IRC § 47. While there do not appear to be any recapture provisions in the state income tax code, sale of the property results in revocation of the certification necessary to qualify for the credits. Any purchaser or transferee would have to apply for a new certificate for any remaining unused credits. Finally, accelerated depreciation deductions taken would also be recaptured in the year of disposition. As a result, the first user has enormous economic incentives to avoid sale of the property.

■      The second point concerns how an appraiser might view the income tax credits. From one point of view, the tax credits may be seen as a "rebate" or a return *of* capital, thereby reducing the cost of the property to the owners. Under this view, plaintiff's net investment after return of capital via tax credits would be fully justified by the income to be produced from the generation of electricity. From another point of view, however, the income tax credits may be considered a return *on* capital. Under this view, the tax credits must be added to the projected income from the generation of electricity to measure the full return to be realized from the investment. Although it may not matter which view is adopted, treating tax credits as a form of income benefits seems more appropriate. By their nature, income tax credits are related to and depend upon income. Whether the benefit will ever be received depends upon the owner's income, frequently on income from sources other than the property itself. This would appear to be true in this case based on the projected cash flow and tax credits.

With these considerations in mind, the dilemma created by the interplay of these rules becomes clear. In reality, the seller won't sell for less than his cost because of the tax credit recapture provisions. On the other hand, a purchaser won't pay a price which exceeds the capitalized value of all the benefits to be derived from the property. Thus, use of the federal tax credits in the first two months of the life of the property has substantially affected its value.

■      Should the appraiser consider the effect of the federal recapture provisions on the seller? In the court's view, the income tax consequences to the seller must be ignored. There are a number of reasons for this. First and probably foremost is the fact that income tax consequences to the seller usually have no effect on the market value of the property. Second,

income tax consequences may vary drastically from person to person while ad valorem taxes are assessed in rem. It is a well-accepted rule of valuation that the individual personalities and opportunities of particular owners must be ignored. 4 *Nichols on Eminent Domain* ch 12; *State Highway Com. v. Arnold et al*, 218 Or 43, 341 P2d 1089, 343 P2d 1113 (1959).

If recapture of the federal tax credits is ignored, what amount would justly compensate plaintiff for loss of the property? If the tax credits are treated as "income received" from the property, the value is reduced accordingly and plaintiff would receive approximately $8 million. That amount, plus the total tax credits taken, would equal plaintiff's cost of the property. But although ignored by the appraiser, the federal tax credits are nevertheless actually recaptured to plaintiff's loss of $1.8 million. This real economic loss could be explainable as follows: The cause of the loss is not inadequate compensation for the property taken, but the fact that the cost of the property exceeded the value created. Also, the test for "just compensation" is the value of that which is taken. It is the subject property and not plaintiff's tax benefits which are the subject of valuation. While market value may be affected by tax benefits yet to be received, it is not affected by the tax consequences the seller will suffer in the future.

An argument can be made that income tax detriments are recognized by the typical willing seller in the marketplace. Certainly, if the subject property had been taken from plaintiff by eminent domain as of January 1, 1985, plaintiff, at a minimum, would seek compensation in the amount of $9,630,000, which is the cost of the property less the $970,000 in Oregon energy tax credits which are not subject to recapture. However, this approach abandons the concept of market value or value in exchange and looks to the value to the owner. While there may be circumstances where this is appropriate, they must be extremely rare. Income tax consequences to the seller should not be considered in establishing the amount that would justly compensate the owner for loss of the property. Such an approach rests unsteadily on many factors unrelated to the property. For example, although the federal tax credits are taken in the first year, they remain subject to recapture for five years. "Just compensation" to the owner

could suddenly change without regard to the condition or circumstances of the property or the market. Such considerations seem akin to lost business opportunities and other individual values which a particular owner may associate with the property but which are insufficiently identified with the property to be compensable.

■ Plaintiff views the problem from another angle, asserting that loss in value due to tax credits is a form of economic obsolescence. Like the element of value attributed to "new" automobiles, this element of value disappears rapidly. Whether the effect of income tax credits should be viewed as a form of economic obsolescence is uncertain. It is clear that in this case the price of $10,659,000 was not justified by the income projected from the generation of electricity alone. It is also clear that the tax credits were major considerations in the creation and sale of the property. It would seem reasonable, therefore, that as the tax credits are "used' the value of the property is diminished.

Ignoring, then, the recapture provisions of the income tax law but assuming that the availability of the tax credits here have a direct influence on the market value of the property, both the cost approach and the income approach may be utilized in determining the value sought. The evidence indicates that the cost of the property was $10,659,000 and that a total of $2,834,996 (Plaintiff's Brief, at 5) in state and federal tax credits were used by plaintiff prior to January 1, 1985. This leaves an indicated market value of the property as of January 1, 1985, of $7,765,004.

Under the income approach, Mr. Cegelski added the value of the remaining state tax credits, discounted by a time factor, to his estimate of value based on the capitalized value of the income to be derived from the generation of electricity to arrive at an estimated value for the property of $8,000,000. There are some questions that can be raised with this estimate of value inasmuch as Mr. Cegelski did not appear to include the $12,500 of federal investment tax credits available for used property. Also, Mr. Cegelski indicated that the typical investor required a 40 percent pretax return on his investment, which seems high in view of the margin of safety afforded by the tax credits. In any case, the values indicated by the cost

and income approaches are close enough to afford the court a sense of confidence in the analysis.

In light of the above, the court therefore finds the true cash value of the subject property as of January 1, 1985, was $8,000,000. The county assessor and tax collector of Wallowa County shall amend the assessment and tax rolls for the tax year 1985-1986, in accordance with this opinion. If taxes have been paid by plaintiff in excess of those required by the tax roll as amended, the excess, with statutory interest thereon, shall be refunded to plaintiff by the board of county commissioners pursuant to ORS 311.806 and 311.812. Costs to neither party.