# IN THE OREGON TAX COURT

## FALLS CREEK H.P.
## LIMITED PARTNERSHIP
*v.*
## OREGON DEPARTMENT OF REVENUE
(TC 3011)

K. Patrick Neill, Eugene, represented plaintiff.

Joseph A. Laronge, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered October 22, 1991.

## CARL N. BYERS, Judge.

Plaintiff appeals the value of a small hydroelectric plant as of January 1, 1990. The property is subject to central assessment as a utility under ORS 308.515. Accordingly, the market value sought includes intangible as well as tangible property. ORS 308.510.

The plant is about 25 miles east of Sweet Home near the South Santiam River in the Cascade Mountain Range. It includes a small dam which diverts the water from Falls Creek into a penstock. The penstock is an 8,000-foot-long pipe 30 inches in diameter at the dam and tapering to 16 inches at the base. Passing through the penstock the water falls 2,300 feet in elevation before it enters the powerhouse, passes through the turbine and on out to the South Santiam River. The plant includes a generator, switch gear, controls and other ancillary equipment. The fall of over 2,300 feet in elevation spins the turbine at approximately 1,200 revolutions per minute (rpm).

Started in May, 1982, and completed in December, 1984, the project was designed to produce power to sell to Pacific Power & Light Company (PP&L). Plaintiff's contract with PP&L extends until December 31, 2019. As of the assessment date in question, the contract amount paid by PP&L to plaintiff exceeded the cost of power from Bonneville Power Administration (BPA). This differential created a valuable benefit for plaintiff. If, over time, inflation causes the cost of power from BPA to exceed plaintiff's contract price, the benefit will shift to PP&L.

The contract provides for two measures of payment. One measure is for production, starting at $.0623 per kilowatt hour in 1985 and increasing an average 2.498 percent per year thereafter. The other payment measure is for capacity. Plaintiff receives $7.10 per month for each kilowatt of demonstrated capacity. The contract also provides for other adjustments for line losses, transmission line costs and other expenses that PP&L might incur.

The plant is located on United States Forest Service land under a special use permit which expires in 2005. Although plaintiff pays a nominal use fee ($162 per year), the

United States Forest Service may increase the fee substantially.[1] Plaintiff's use of the land is nonexclusive. It must share the land with other compatible uses that may be approved by the United States Forest Service, such as cattle grazing, logging, wildlife habitat and recreation.

The key to the production and value of the subject property is the water supply. Falls Creek has a drainage area of 2.9 square miles. It is a small creek with a water flow up to 200 cubic feet per second in the wintertime and as little as one cubic foot per second in the summertime. The plant cannot use more than 28.5 cubic feet per second. Consequently, much of the runoff during the peak periods cannot be used. On the other hand, sometimes during the low runoff months the plant cannot operate due to lack of water. As plaintiff's general manager pointed out, the evenness of the water flow is as important as the total amount of water.

Each party had a qualified appraiser as its expert witness. Both appraisers used the cost approach and the income approach and both gave some consideration to the direct sales comparison approach. The court will discuss the positions of the parties and its analysis of each approach.

## COST APPROACH

Plaintiff's appraiser used a reproduction cost new approach. Using a 40-year life and straight-line depreciation, he determined that the cost of reproduction less physical depreciation was $3,931,684. From this amount he deducted $100,000 for functional obsolescence due to a problem with the diversion dam. He also deducted $1,600,000 for economic obsolescence because tax credits are no longer available to subsidize construction of hydroelectric projects. This gave him an indicated value for the cost approach of $2,231,684 (rounded to $2,250,000).

Defendant used plaintiff's historical costs, trended for inflation, totaling $5,046,162. Defendant's witness used a

---

[1] The permit states:

"Charges for this use may be made or readjusted whenever necessary to place the charges on a basis commensurate with the value of the use authorized by this permit."

45-year life and straight-line depreciation, resulting in a reproduction cost new less depreciation of $4,506,052.

■     The large investment tax credits and energy tax credits afforded to small hydroelectric projects during the 1980s present significant appraisal problems. *See Joseph Hydro Associates, Ltd. v. Dept. of Rev.*, 10 OTR 277 (1986). It is undisputed that such projects are not built without the tax credits. This raises the question of whether much weight can be given to the cost approach. The cost approach rests on the principle of substitution.

> "The principle of substitution holds that people will not pay more for a property than the cost of a satisfactory substitute with equal utility assuming no unreasonable delay in obtaining the substitute property. Also, a knowledgeable owner of the property will not sell the property for less than the current cost of a substitute property." Western States Association Of Tax Administrators Appraisal Handbook, *Valuation of Utility And Railroad Property* 16 (1989).

If there will be no substitution without the availability of major tax credits, how realistic is it to consider cost as a measure of value? If the basic premise of the approach is inapplicable, should the approach be given any weight?

Plaintiff's appraiser considers the absence of tax credits as economic obsolescence. That is, the projected benefits from the project have been reduced due to external causes. This results in a reduced indication of value.

One analysis is to compare the benefits to be derived from the subject property with the benefits that can be derived from a substitute property. The elimination of tax credits by the government has the effect of increasing the real cost of the project. Although an increased cost for a substitute property would normally indicate a higher value for the subject property, that is not the case here. Value is a result of the anticipated benefits to be received from property. If the benefits (income) to be received from the substitute property have not increased, then its value will be less than its cost. Thus, without some adjustment, defendant's cost approach overstates the value of the subject property.

■     The court finds that plaintiff's depreciated reproduction cost of $2,250,000 is the more accurate indication of

value by the cost approach. However, the cost approach can be given little weight because there is no real possibility of a buyer choosing to construct a substitute property.

## MARKET APPROACH

The only comparable sale proposed by either party was the Joseph Hydro plant located in Wallowa, Oregon. The court has some reservations about using this sale. Neither party had complete information about the sale, which was still pending at the time of trial. Plaintiff's appraiser made a comparison based upon the ratio between Joseph Hydro's sale price and its annual production. However, he assumed a higher production than was actually realized.

Plaintiff's manager testified that the industry is "skeptical" of theoretical maximums. Plaintiff's appraiser testified that purchasers would rely on actual rather than projected production. For these reasons, and due to the nature of the business, the court believes the most reasonable basis for comparisons and analysis is actual rather than projected production.

The court finds that Joseph Hydro's average production for the years 1986 through 1990 was 8,368,349 kilowatt hours, producing an average gross revenue of $568,317, or $.0679126 per kilowatt hour. Likewise, the subject's average production for the years 1985 through 1989[2] was 13,595,379 kilowatt hours, producing an average gross revenue of $1,047,048, or $.077 per kilowatt hour. These actual results indicate the subject property earned approximately 13 percent more revenue per kilowatt hour produced than Joseph Hydro.

The court finds $2,200,000, set forth in the letter from Consolidated Hydro, Inc., as the sale price for Joseph Hydro. A sale price of $2,200,000 for 8,368,349 kilowatt hours of production gives an indicated price per kilowatt hour production of $.2629. Multiplying this factor times the subject's average production of 13,595,379 kilowatt hours results in an indicated value of $3,574,225. If this is increased by the 13 percent difference between Joseph Hydro's revenue

---

[2] The information in the record for the two plants does not permit comparison for exactly the same years.

per kilowatt hour and the subject's revenue per kilowatt hour, it results in a total indication of value for the subject of $4,038,874.

As indicated, the market approach indicator is to be viewed with caution. The purchaser of Joseph Hydro intended to increase production at some additional unknown cost. The sale was still pending at the time of trial and neither party knew all the terms of the sale. Additionally, the ratio of revenue-to-expenses is not known for Joseph Hydro. These facts all prevent a good comparison with the subject property. For these reasons, this indication of value should be viewed with some skepticism.

## INCOME APPROACH – DIRECT CAPITALIZATION

Plaintiff's appraiser used a direct capitalization approach based on the Joseph Hydro sale. To do so, he estimated Joseph Hydro's production at 12 million kilowatt hours per year. He multiplied that production by a sales rate of $.078 per kilowatt hour to derive an estimated gross revenue of $936,000. Using a 54 percent expense ratio, he calculated a net income of $430,560. Dividing this net income by the sale price of $1,700,000, resulted in a capitalization rate of 25.3 percent.

■ Again, the court does not believe that estimates of production should be used in place of actual production. Although the buyer of Joseph Hydro may have based its purchase price on an estimated production of 12 million kilowatt hours, it also anticipated additional capital expenditures. There is no evidence to indicate how additional investment could increase production, or how it would affect operating expenses. If the sale is to be used, a comparison of actual production and revenue is the best basis for such a comparison.

Plaintiff's direct capitalization rate should be based on an average production of 8,368,349 kilowatt hours. Assuming the rate was $.078 per kilowatt hour, this would result in a gross revenue of $652,731. Applying plaintiff's expense ratio of 54 percent gives a net income of $300,256. Dividing the net income of $300,256 by the purchase price of $2,200,000 results in a direct capitalization rate of 13.6 percent. Plaintiff used an expense ratio of 44 percent in

estimating its own net income. If that expense ratio is used for Joseph Hydro, the calculation yields a net income of $365,529, resulting in a direct capitalization rate of 16.6 percent.

Plaintiff calculates the subject's net income at $591,442. Applying a direct capitalization rate of 13.6 percent to that income gives an indicated value of $4,348,838, while a rate of 16.6 percent gives an indicated value of $3,562,903. If a 54 percent expense ratio is applied to plaintiff's gross revenue, as was applied to Joseph Hydro, plaintiff's net income would be $487,789. Dividing this income by the direct capitalization rate of 13.6 percent gives an indicated value of $3,586,683 and dividing it by 16.6 percent gives an indicated value of $2,938,488.

## INCOME APPROACH—DISCOUNTED CASH FLOW

The court is not comfortable with either party's discounted cash flow analysis. Plaintiff's appraiser used a discount rate which he could neither explain nor support with market data. Further, he confused the concepts of a direct capitalization rate and a yield rate. He added to the confusion by using a capital recovery factor for 20 years. There is some evidence to support his use of a discount rate of 19 percent (without the factor for recovery of capital). Using his other assumptions, this would result in an indicated value of $2,921,657.[3]

Defendant's discounted cash flow analysis is no stronger. Defendant projected steadily increasing production. Starting with 13,500,000 kilowatt hours per year he projected increases to 15,697,674 kilowatt hours in the year 2005. The appraiser testified that this steady increase was based on WEFA tables, which are basically economic forecasts for energy demand (fourth quarter 1989). The problem with this approach is that the WEFA tables are totally irrelevant to plaintiff's production. Plaintiff's production is a function of runoff, not national energy demands or capacity. The appraiser would be far better off using a long-term weather

---

[3] Plaintiff's appraiser assumed that all expenses would rise five percent a year. However, the management fee is 8.5 percent of gross revenues and should not be increased except in proportion to revenues. Making that correction gives an indicated value of $2,995,026.

forecast than an economic forecast to estimate plaintiff's production. Moreover, plaintiff has a contract to sell its power to PP&L. Its ability to sell its power is not affected by the energy needs or capacity of the nation.

Despite his testimony to the contrary, it appears that defendant's appraiser misinterpreted a chart comparing plaintiff's actual and theoretical production for five years and carried that false impression into his analysis for this appraisal.[4] The production reflected on that chart is not in chronological sequence and does not indicate an "upward slope." The chart provides no basis for projecting a steady increase in production as shown on defendant's discounted cash flow model. Projecting a steady increase gives a false impression as to the timing of the cash flows, growth in cash flows and increases in capacity payments.

■ The court is also uncomfortable with defendant's discount rate of 12.22 percent. This rate is a weighted average cost of capital based on a debt-equity ratio of 60 percent debt and 40 percent equity. Using a 12 percent rate for debt and a 20 percent rate of return for equity, the appraiser calculated an after tax cost (weighted average) of capital at 12.22 percent.[5]

There are attributes in this case that lead the court to believe the overall rate should be higher. The subject is a small hydroelectric project. Smaller projects have a higher cost of capital. One reputedly knowledgeable source indicated that a "project" such as the subject property *without debt* would require a discount rate of 19-22 percent. The buyer of the Joseph Hydro facility indicated that it evaluates purchases of hydroelectric facilities using a discount rate on free cash flows of 17 to 20 percent. These rates do not seem consistent with a weighted average cost of capital of 12.22 percent, even given the effect of 60 percent debt financing. Certainly applying the 19-22 percent range of rates to the free cash flows gives a different result than defendant's debt-weighted rate.

---

[4] In connection with the hearings at the administrative level, the appraiser projected a steady increase in production based upon plaintiff's chart.

[5] The appraiser showed a rounded 12.22 percent, but the actual rate used was 12.2192 percent.

■ Another risk factor is that the subject is on United States Forest Service land with its limiting conditions. Plaintiff may be subject to substantial fee increases. Also, one of the conditions of the United States Forest Service permit is that the property must be restored to its natural state when the use terminates. Defendant's appraiser made no adjustment for this condition because he assumed use into perpetuity. He testified that his opinion of value would not be affected by whether the property is located on land owned in fee or on United States Forest Service land. The court finds that the conditions associated with being on United States Forest Service land must be considered in determining the value of the subject property. For example, defendant's discounted cash flow value includes $817,061 of residual value. The court believes that any residual value would be offset by the costs of restoration. Thus, defendant's terminal value should be eliminated, leaving defendant's discounted cash flow analysis showing a value of $3,604,863.[6]

## RECONCILIATION

■ Reconciling the indications of value requires the court to consider the weaknesses more than the strengths of each approach. In the cost approach, the fact that tax credits are no longer available renders the principle of substitution inapplicable. Little, if any, weight can be given to an approach which both parties admit is not a realistic option for the market. Plaintiff's appraiser relied upon this approach entirely, giving no weight to the other approaches. By contrast, defendant's appraiser testified that he knew up front he would not place major reliance upon the cost approach. However, his appraisal report indicates he gave "equal consideration" to the cost approach and the income approach.

The market approach, as calculated by the court and based on the actual average productions of Joseph Hydro on the subject, gave an indicated value of $4,038,874. However, this is based on limited knowledge of one sale which was still pending at the time of trial. The number of assumptions made

---

[6] This figure is arrived at by adding the present values of cash flows for 1990-2004 and adding a figure of $86,055 for 2005 (*i.e.,* cash flow of $544,315 multiplied by a corrected discount rate of .1580977).

and points of noncomparability ignored make this approach less than reliable.

In the income approach, plaintiff's direct capitalization method, as corrected by the court, gave a range of values from a low of $2,938,488 to a high of $4,348,838 depending upon whether a 54 percent or a 44 percent expense ratio was used. Plaintiff's discounted cash flow, as adjusted by the court, gave an indicated value of $2,921,657.[7] If the residual value is deleted from the defendant's discounted cash flow to offset restoration expenses, it indicates a value of $3,604,863.

The court has also considered defendant's "reality test." In that test, defendant estimates a future free cash flow of $681,724 and divides it by a before-tax capitalization rate of 15.2 percent to get an indicated value of $4,989,642. However, if one uses a free cash flow of $665,746 (without defendant's growth) and a discount rate of 18.5 percent (an average of the range of 17-20 percent demanded by the buyer of Joseph Hydro) it results in an indicated value of $3,598,627.

In the court's opinion, the range of value for the subject is between $2,900,000 and $4,300,000. Where the same expense ratio is applied to both the subject and Joseph Hydro, the indicated values by direct capitalization are $3,562,903 and $3,586,683. These can be compared with the court's "reality test" indication of value of $3,598,627. These indications of value are in the center of the range, whereas the other indicators are near the extremes and are more questionable. Accordingly, the court finds the true cash value of the subject property as of January 1, 1990, was $3,500,000. Costs to neither party.

---

[7] *See* 12 OTR at 61 n 3. Indicated value is $2,995,026 when making correction for management fee.